IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| R.S., by and through his father, RONALD E. SOLTES, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:16-cv-119 |
| BOARD OF DIRECTORS OF WOODS CHARTER SCHOOL COMPANY, WOODS CHARTER SCHOOL, and DOES 1 TO 10, inclusive, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

Plaintiff R.S. filed this action through his father, Ronald E. Soltes, against Defendants Board of Directors of Woods Charter School Company, Woods Charter School (together, "WCS"), and Does 1 through 10,[1] alleging violations of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. Before the court are cross-motions for summary judgment. For the reasons set forth below, R.S.'s motion will be granted and WCS' motion will be denied.

---

[1] The complaint states that R.S. is "ignorant of the names and capacities of the Defendants sued herein as DOES 1 to 10" and that he "will seek leave of Court to amend this Complaint to allege the true names and capacities of said defendants when they have been ascertained." (Doc. 32 at 4.) R.S. did not allege the true names and capacities of these Defendants in his first amended complaint, and his motion for leave to file a second amended complaint was denied. (Doc. 36.)

## I.  BACKGROUND

### A.  Individuals with Disabilities Education Act

"Congress enacted IDEA in 1970 to ensure that all children with disabilities are provided 'a free appropriate public education which emphasizes special education and related services to meet their unique needs [and] to assure that the rights of [such] children and their parents or guardians are protected.'" Forest Grove Sch. Dist. v. T.A., 557 U.S. 230, 239 (2009) (alterations in original) (footnote omitted) (quoting Sch. Comm. of Burlington v. Dep't of Educ. of Mass., 471 U.S. 359, 367 (1985)).  To accomplish this goal, the "IDEA requires all states receiving federal funds for education to provide disabled schoolchildren with a 'free appropriate public education' ('FAPE')," Cty. Sch. Bd. of Henrico Cty. v. Z.P. ex rel. R.P., 399 F.3d 298, 300 (4th Cir. 2005) (quoting 20 U.S.C. § 1412(a)(1)(A)), which "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child to benefit from the instruction."  Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley, 458 U.S. 176, 188–89 (1982) (internal quotation marks omitted).

More specifically, the IDEA requires that States "ha[ve] in effect policies and procedures to ensure that the State" provides a FAPE.  20 U.S.C. § 1412(a); see also North Carolina Department

2

of Public Instruction, <u>NC Policies Governing Services for Children with Disabilities</u>, Public Schools of North Carolina, https://ec.ncpublicschools.gov/policies/nc-policies-governing-services-for-children-with-disabilities (last visited Feb. 26, 2019) ("NC Policies").  "[T]he definition of a FAPE under the IDEA requires that educational services meet the standards of the State educational agency," and therefore "[a] school run by a state or political subdivision of a state . . . must meet the standards established by the governing state educational agency, which in turn must meet or exceed the IDEA's minimum requirement." <u>G ex rel. RG v. Fort Bragg Dependent Sch.</u>, 343 F.3d 295, 304 (4th Cir. 2003) (internal quotation marks omitted).

A FAPE is tailored by the local educational agency ("LEA") to meet the needs of the disabled child through the development and implementation of an "individualized education program" ("IEP"), created through a collaborative process by an IEP team consisting at least of the child's parents, teachers, and an LEA representative.  20 U.S.C. § 1414(d).  "An appropriate IEP must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." <u>MM ex rel. DM v. Sch. Dist. of Greenville Cty.</u>, 303 F.3d 523, 527 (4th Cir. 2002). While FAPEs and IEPs "must be reasonably calculated to confer some

3

educational benefit on a disabled child," LEAs are not required "to provide a disabled child with the best possible education." Id. at 526.

Where a disabled child's parents or guardians have grievances with respect to an LEA's provision or non-provision of a FAPE, they are entitled to file a complaint against the LEA and to receive "an impartial due process hearing" conducted by a state officer "as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f). The parents or guardians have the right to be accompanied by counsel, the right to present evidence as well as to confront, cross-examine, and compel the attendance of witnesses, and the right to receive the written records and findings of the hearing officer. Id. § 1415(h).

In North Carolina, the initial due process proceedings are held by an administrative law judge ("ALJ") appointed by the North Carolina Office of Administrative Hearings ("OAH"). E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ., 773 F.3d 509, 513 (4th Cir. 2014) (citing N.C. Gen. Stat. § 115C-109.6). The parties may appeal the ALJ's findings of fact and conclusions of law to a state review officer ("SRO") appointed by the North Carolina Board of Education ("BOE"), who makes an independent decision on the written record. Id. (citing N.C. Gen. Stat. § 115C-109.9). Once this administrative review process has been exhausted, dissatisfied parties may bring a civil action in federal district

4

court within 90 days of the final state administrative decision. 20 U.S.C. § 1415(i)(2). Pursuant to the IDEA, the court "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." Id.

**B. Procedural Posture**

On October 31, 2014, R.S., by and through his parents ("Father" and "Mother"), initiated a due process proceeding against WCS, the BOE, and the North Carolina Department of Public Instruction ("DPI"), contending that WCS had denied him a FAPE during the 2013-2014 school year. (Doc. 55-1 at 6-7.) OAH appointed Sidney S. Eagles, Jr. as the ALJ for the matter. (Id. at 7.) On May 28, 2015, the ALJ dismissed BOE and DPI as Respondents. (Id. at 8.) On October 22, 2015, after hearing the evidence, the ALJ issued a 61-page final decision finding that WCS denied R.S. a FAPE on numerous grounds and granting him extensive compensatory education. (Id. at 61.) WCS timely appealed, and BOE appointed Joe D. Walters as SRO for the appeal. (Doc. 55-2 at 3, 10.) The SRO received written arguments from the parties on December 30, 2015, and issued a 34-page decision on January 14, 2016, rejecting the ALJ's findings of fact, reversing most (but not all) of the ALJ's conclusions of law, and granting R.S. reduced compensatory education on the basis of a single denial of FAPE in

5

that WCS failed to timely develop a North Carolina IEP for R.S. (Id. at 10, 33–34, 37.)

On February 16, 2016, R.S. filed a civil action in this court, praying for the SRO's decision to be reversed and the ALJ's decision to be reinstated, as well as for attorneys' fees. (Doc. 1.) WCS filed an answer and counterclaim, praying for the SRO's decision to be affirmed, except for the finding of failure to timely develop a North Carolina IEP, and urging that no compensatory education be awarded. (Doc. 8 at 31.) R.S. requested additional discovery, which the Magistrate Judge denied. (Doc. 19.) R.S.'s attorneys subsequently requested that they be allowed to withdraw from their representation of R.S. (Docs. 27, 28), and the Magistrate Judge granted the requests. R.S. filed an amended complaint (Doc. 32) through new counsel on August 31, 2017, with the court's leave, and WCS answered (Doc. 37). The parties filed cross-motions for summary judgment on April 23, 2018. (Docs. 50, 52.)

### C. Due Weight Determination

The court's first task is to determine the weight due the state administrative factfinding in this case. Although the court must ultimately make its own legal determination on "the preponderance of the evidence," 20 U.S.C. § 1415(i)(2)(C), the Supreme Court has held that the IDEA's requirement that the court "receive the records of the administrative proceedings" amounts to

6

an "implied requirement that due weight shall be given to these proceedings." Rowley, 458 U.S. at 206. The Fourth Circuit has since elaborated that, where the administrative findings of fact are "regularly made," those findings of fact "are entitled to be considered *prima facie* correct." Doyle v. Arlington Cty. Sch. Bd., 953 F.2d 100, 105 (4th Cir. 1991). "Factual findings are not 'regularly made' if they are reached through a process that is 'far from the accepted norm of a fact-finding process.'" Z.P., 399 F.3d at 305 (quoting Doyle, 953 F.2d at 104).

The Fourth Circuit has repeatedly cautioned district courts not to reject an IDEA hearing officer's findings of fact because of mere disagreements about credibility determinations or the officer's perceived failure to explain his findings in sufficient detail. See, e.g., J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va., 516 F.3d 254, 261 (4th Cir. 2008) (noting that Fourth Circuit "case law does not require an IDEA hearing officer to offer a detailed explanation of his credibility assessments," and that even where "the hearing officer d[oes] not explicitly state that he found the School Board's witnesses more persuasive, . . . implicit credibility assessments 'are as entitled to deference under Doyle as explicit findings'" (quoting Z.P., 399 F.3d at 307)); id. at 262 (holding that a hearing officer's findings should be given deference despite being "about as bare-boned as they could be" and "the opinion offer[ing] no explanation

7

of which evidence the hearing officer found to be most important or why the hearing officer was persuaded by the School Board's evidence").

In two-tiered IDEA review systems like the one employed by North Carolina, the IDEA appeals officer must show like deference to the IDEA hearing officer. E.L. ex rel. G.L. v. Chapel Hill-Carrboro Bd. of Educ., 975 F. Supp. 2d 528, 537 (M.D.N.C. 2013) ("The SRO is required to give due weight to the ALJ's factual findings, presuming them to be *prima facie* correct if regularly made."), aff'd, 773 F.3d 509 (4th Cir. 2014). Where the IDEA appeals officer improperly rejects the IDEA hearing officer's findings, the reviewing district court should credit the IDEA hearing officer's factual findings, rather than the findings of the appeals officer. See Fort Bragg, 343 F.3d at 303 ("[W]here a reviewing officer or board reaches a factual conclusion opposed to one reached by the hearing officer but in doing so departs from the normal process of fact-finding, its decision may be entitled to little or no deference."); Wittenberg v. Winston-Salem/Forsyth Cty. Bd. of Educ., No. 1:05CV818, 2008 WL 11189389, at *6 (M.D.N.C. Nov. 18, 2008) ("[A]n SRO's decision would not be regularly made if the SRO failed to give the ALJ's factual findings the appropriate deference.").[2]

---

[2] On the other hand, "[w]here the administrative proceedings are two-tiered and both the ALJ and SRO reach the same conclusion, their findings

If a district court determines that an IDEA administrative officer's findings of fact are "regularly made" and thus "entitled to *prima facie* correctness, the district court, if it is not going to follow them, is required to explain why it does not." Doyle, 953 F.2d at 105. No deference is accorded an IDEA administrative officer's conclusions of law. E.L., 975 F. Supp. 2d at 537 ("A district court must review findings about the IDEA's legal requirements *de novo*."); Fitzgerald v. Fairfax Cty. Sch. Bd., 556 F. Supp. 2d 543, 550 (E.D. Va. 2008). Therefore, once the district court concludes its factfinding — including a "due weight" determination — the court makes an independent legal determination "on the preponderance of the evidence, as required by the statute." Doyle, 953 F.2d at 105.

In the instant case, the SRO rejected the ALJ's factual findings wholesale. The SRO's only explanation of his decision on this issue is as follows:

> Upon reviewing the ALJ's Decision, the transcript of the hearing, and the entered exhibits, the Review Officer cannot reconcile many of the ALJ's facts with the actual record. It was discovered that the ALJ took almost all of the Petitioners' proposed decision and used it as the ALJ's Decision, even though it was clearly biased and included only the Petitioners' version of the facts. Some of the Petitioners' facts were clearly contradicted by the record of exhibits and testimony. Days of testimony and many exhibits were totally ignored by the

are accorded greater deference." Cone v. Randolph Cty. Sch. Bd. of Educ., 657 F. Supp. 2d 667, 673 (M.D.N.C. 2009) (citing Fort Bragg, 343 F.3d at 302–03).

9

ALJ.  Entirely missing is the testimony provided by the
teachers from Woods Charter School.

For the reasons mentioned above, the district court
judge in Wittenberg . . . held that an [ALJ's] findings
were entitled to no deference and were not entitled to
be considered prima facie correct under Fourth Circuit
precedent.  The SRO holds that the findings of the ALJ
in this case were not regularly made.  As in Wittenberg,
the findings are not entitled to be considered prima
facie correct.

(Doc. 51-2 at 9.)  While the ALJ's opinion may fall short of the

"aspirational standard" of "thorough[ness]" and "detailed

analysis" the Fourth Circuit has admitted "would of course be

preferable," J.P., 516 F.3d at 263, the court cannot agree with

the SRO that the ALJ's findings of fact are so sweepingly deficient

as not to be entitled to any deference.

The SRO first took issue with the ALJ's decision to adopt

R.S.'s proposed findings with only minor edits.  It is true that

federal district courts are ordinarily discouraged from "adopting

the prevailing party's proposed findings of facts."  Cuthbertson

v. Biggers Bros. Inc., 702 F.2d 454, 458 (4th Cir. 1983).[3]  But

the standards governing district court opinions do not necessarily

---

[3] The Supreme Court later noted that its own "previous discussions of
the subject suggest that even when the trial judge adopts proposed
findings verbatim, the findings are those of the court and may be
reversed only if clearly erroneous."  Anderson v. Bessemer City, 470
U.S. 564, 572 (1985) (also noting that additional factors can bolster
the strength of a district court decision adopting a party's proposed
findings); see also Aiken Cty. v. BSP Div. of Envirotech Corp., 866 F.2d
661, 677 (4th Cir. 1989) (denying due process challenge to district
court's order adopting prevailing party's proposed findings because the
findings still "represent[ed] 'the judge's own considered conclusions,'"
(quoting Anderson, 470 U.S. at 573)).

govern the decisions of IDEA administrative officers. In fact, the Fourth Circuit has stated that IDEA hearing officers — who operate "under tight time constraints," typically without the same level of staff support as federal courts — "cannot be expected to craft opinions with the level of detail and analysis . . . expect[ed] from a district judge." J.P., 516 F.3d at 263; see 34 C.F.R. §§ 300.510(b), 300.515 (setting timelines for IDEA due process proceedings). With these considerations in mind, the court does not agree with the SRO that the ALJ's findings of fact should be rejected on the basis that he largely adopted R.S.'s proposed findings. See B.F. v. Fulton Cty. Sch. Dist., No. 1:04-CV-3379-JOF, 2008 WL 4224802, at *25 (N.D. Ga. Sept. 9, 2008) ("The court agrees that the [ALJ] primarily (but not solely) adopted the chronology of facts as set forth by Defendant, but disagrees that this per se means the court should not defer to the [ALJ]").

The SRO next took issue with the ALJ's treatment of the record, alleging that some of the decision's "facts were clearly contradicted by the record" and that the ALJ "totally ignored" swaths of evidence. (Doc. 51-2 at 9.) The only instance of this phenomenon the SRO identifies with any specificity is that "the testimony provided by the [WCS] teachers" is "[e]ntirely missing." (Id.) The ALJ, however, provided reasons for declining to rely on this evidence, finding WCS' "testimonial evidence" to be "generally conclusory in nature" and "not persuasive," especially

11

where a WCS employee violated North Carolina policies by unilaterally shredding some of R.S.'s IEP documents "mere days after receiving [them]" and "the evidence showed that WCS did not reduce [the] comparable services [it was required to provide] to writing until months after [R.S.] first began attending." (Doc. 51-1 at 41–42.) This amounts to a credibility determination,[4] and is therefore entitled to deference. See Z.P., 399 F.3d at 306-07 ("[T]he hearing officer's analysis and explanation for the basis of his ruling make it clear that he was not persuaded, { "pageset": "Sb1 and why he was not persuaded by the School Board's evidence. We have held that credibility determinations implicit in a hearing officer's decision are as entitled to deference under Doyle as explicit findings."); see also S.A. v. Weast, 898 F. Supp. 2d 869, 878 (D. Md. 2012) ("[B]y not addressing [certain] testimony, the ALJ made an implicit credibility determination that is entitled to

---

[4] In addition to the language quoted above, which applies specifically to the ALJ's decision to reject the WCS teachers' evidence, the ALJ also makes the following general statement at the beginning of his findings:

> In making the findings of fact, the undersigned has weighed all the evidence and has assessed the credibility of the witnesses by taking into account the appropriate factors for judging credibility, including, but not limited to, the demeanor of the witnesses, any interests, bias, or prejudice the witnesses may have, the opportunity of the witnesses to see, hear, know or remember the facts or occurrences about which the witnesses testified, whether the testimony of the witnesses is reasonable, and whether the testimony is consistent with all other believable evidence in the case.

(Doc. 55-1 at 10.)

deference by the Court."); id. at 875 ("Although a more detailed analysis is always preferable, an ALJ's failure to meet this aspirational standard is no basis for concluding that his or her findings were not regularly made and thus not entitled to deference.").

As discussed above, the Fourth Circuit has time and again disapproved of reversing an IDEA hearing officer's credibility determination — whether on the part of the IDEA appeals officer or the district court — even when the hearing officer provides little insight into his underlying reasoning. See id.; J.P., 516 F.3d at 262-63; Doyle, 953 F.3d at 104. In fact, the Fourth Circuit has required that the court find evidence to be so overwhelmingly compelling that it is "of the nature and quality that would require the hearing officer to accept it" before reversing an IDEA hearing officer's credibility determination. Z.P., 399 F.3d at 306.

Here, the court cannot say that the testimony of the WCS teachers was so compelling that the ALJ was required to accept it. To the extent the court finds that certain discrete facts should have been (and will be) considered in the resolution of this case, see footnote 21, infra, these minor discrepancies are not sufficient to show that the ALJ's findings of fact — as a whole — were irregularly made. See J.P., 516 F.3d at 259 (an IDEA hearing officer's findings were regularly made when the officer "allow[ed] the parents and the School Board to present evidence and make

13

arguments," and "resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case"); Weast, 898 F. Supp. 2d at 878 ("[C]riticism of a finding's substance, rather than the process in which [the] finding was made, is precisely the type of argument rejected by the Fourth Circuit as insufficient to demonstrate that fact-findings were not regularly made.").[5]

As a final matter, the court disagrees with the SRO that Wittenberg v. Winston-Salem/Forsyth Cty. Bd. of Educ., No. 1:05CV818, 2008 WL 11189389 (M.D.N.C. Nov. 18, 2008) compels a rejection of the ALJ's factual findings in this case. In Wittenberg, the SRO — incidentally, the same SRO as in the instant case — rejected the ALJ's findings, and the district court agreed. But although the district court there quoted the SRO's short paragraph explaining his rejection of the ALJ's findings, and although that paragraph reads strikingly similarly to the SRO's

---

[5] While courts "generally focus[] on the process of fact-finding when determining whether a hearing officer's factual findings were regularly made and thus entitled to deference," the Fourth Circuit has "assume[d] that, in a proper case, the manner in which a hearing officer's factual findings are presented could be so deficient as to deprive the opinion of the deference to which it would otherwise be entitled." J.P., 516 F.3d at 260; see Springer v. Fairfax Cty. Sch. Bd., 134 F.3d 659, 663 n.* (4th Cir. 1998) (declining to show deference to an IDEA hearing officer's findings when, among other deficiencies, they were "both cursory and conclusory"). In the instant case, the ALJ's 93-paragraph findings of fact are not "cursory and conclusory," Springer, 134 F.3d at 663 n.*, nor are they otherwise so thoroughly deficient in their presentation that they should be deprived of all deference.

brief explanation in the instant case,[6] the district court also pointed out the difficulties caused by the vague, conclusory nature of the SRO's explanation. See id. at *6 n.7. As a result, the district court undertook its own exhaustive review of the record, concluding that the ALJ had made such significant errors that "the entire factfinding process" had been "improperly affected," and that even the ALJ's credibility determinations were "the result, at least in part, of [his] application of an erroneous legal standard" — in addition to an assortment of smaller errors. Id. at *25-35. Since the ALJ in Wittenberg "did not limit his use of a fundamentally flawed and legally irregular process of factfinding" to any discrete set of findings, but instead used that process "to analyze all evidence presented during the due process hearing," the district court gave no deference to the ALJ's findings. Id. at 35 (emphasis added). In the instant case, the court has not uncovered errors on the ALJ's part that taint "the entire factfinding process." Id. at 25.

In conclusion, upon weighing the SRO's reasoning, the parties' arguments,[7] and the administrative record, the court determines that the ALJ's findings of fact were regularly made and

---

[6] For a third example of the SRO employing the same paragraph to reject the ALJ's findings of fact, see Cone, 657 F. Supp. 2d at 678 n.15.

[7] WCS urges that the ALJ's findings of fact be rejected for the same reasons stated by the SRO and does not offer substantially different or more detailed arguments to that effect. See (Doc. 53 at 8-9; Doc. 60 at 4-5).

therefore entitled to be considered *prima facie* correct.[8]

### D. **Facts**[9]

R.S. was born in 2000 and is diagnosed with Non-Verbal Learning Disability. (Doc. 55-1 at 9.) During the 2008-2009 school year, while R.S. was enrolled as a third-grader in the Wake County Public School System of North Carolina, he was found eligible for special education under the category of "Specific Learning Disability." (Id.) An IEP was developed for him. (Id.) He remained eligible (and enrolled in the Wake County Public School System) through the 2009-2010 school year, after which he was homeschooled for two years by his parents. (Id.) During the 2012-2013 school year, he attended public school in the Pocono Mountain School District ("PMSD") of Pennsylvania under an IEP developed there for him. (Id.) On August 20, 2013, R.S. enrolled as an eight-grader at WCS, in Chatham County, North Carolina. (Id.)

Mother had informed WCS of R.S.'s special education status in his application to the school, so — upon accepting the WCS admissions offer on R.S.'s behalf — she was put in contact with WCS' "Special Education Director," Lawrence "Buddy" Smiley. (Id.

---

[8] As a result, the court will not give deference to the SRO's findings of fact. See Fort Bragg, 343 F.3d at 303; Wittenberg, 2008 WL 11189389, at *6.

[9] Citations to the IDEA administrative hearing transcript will be denoted "Tr. Vol. _ at _." Citations to R.S.'s and WCS's exhibits introduced at that hearing will be denoted "P. Ex. _" and "R. Ex. _." R.S.'s exhibits, which are mostly numbered continuously beginning with the first exhibit, will be cited to the continuous page number.

16

at 11.)  On August 1, 2013, PMSD mailed WCS R.S.'s educational records, including IEP documents.  (Id.)  On August 15, 2013, Smiley mistakenly gave R.S.'s records to a special education teacher from the Chapel Hill-Carrboro City school system.  (Id.) After the teacher notified Smiley of the mistake, Smiley directed her to shred the documents, under the erroneous assumption that WCS had copies on file.  (Id.; Tr. Vol. 2 at 233.)  On August 19, 2013, PMSD Principal Dr. Kathleen Fanelli emailed WCS the latest copy of R.S.'s IEP, along with a "Speech/Language Progress Report," and Father later sent other missing documents at Smiley's request. (Doc. 55-1 at 12, 16.)  The PMSD IEP called for 21 accommodations, including speech and language services, occupational therapy, adapted physical education, and assistive technology.  (P. Ex. 14 at 148–51.)

R.S. began attending WCS on August 20, 2013, and received speech and language services and occupational therapy beginning in early September.  (Doc. 55-1 at 15–16, 18.)  R.S.'s gym teacher testified that he took account of R.S.'s limitations in his provision of physical education.  (Id. at 20.)  On September 13, 2013, Smiley met with R.S.'s teachers individually to discuss the accommodations set out in R.S.'s PMSD IEP.  (Id. at 17.)  Smiley and WCS's principal, Cotton Bryan, held an informal meeting with R.S.'s parents on September 19 to discuss the parents' concerns and the status of efforts to develop a new IEP for R.S.  (Id. at

17

18; P. Ex. 44 at 499–500.)  As of October 5, 2013, R.S.'s grades were the following: D+ in Social Studies, F in Science, B+ in Language Arts, A+ in Chorus, F in Math, and "COM"[10] in both Physical Education and Art.  (Doc. 55-1 at 19.)  By this time, R.S.'s parents had begun expressing concerns about R.S.'s academic progress and questioning WCS's provision of accommodations — in Smiley's words, communication between the school and parents had become "strained."  (Id. at 17, 20.)

Although WCS had proposed earlier IEP meetings (P. Ex. 31), WCS ultimately did not hold its first formal IEP meeting for R.S. until October 28, 2013.  (Doc. 55-1 at 23.)  Little was accomplished at that meeting, and communication between the school staff and parents continued to suffer despite the presence of an impartial "facilitator" sent (upon Smiley's request) from DPI in an attempt to strengthen the parties' cooperation.  (Id. at 20, 23; P. Ex. 51.)  A second IEP meeting — this time via telephone — was scheduled for 12:30 p.m. on November 1 with WCS staff, Father, and the DPI facilitator.  (R. Ex. 37.)  Father did not answer the phone at the appointed time, and the IEP team held the November 1 meeting without him.  (R. Exs. 44, 46.)  The team used the meeting to finalize documents finding R.S. eligible for special education

---

[10] "COM" is short for "commendable," which is "the highest grade that [a student] can earn . . . for a special elective."  (Tr. Vol. 1 at 117.)

services.  (Doc. 57-1 at 25.)  Smiley sent these documents to the parents, including a draft IEP.  (Id.)

Smiley scheduled a third IEP meeting for November 12, 2013, and invited R.S.'s parents.  (Id.)  By this time, R.S.'s absences and missed homework assignments had begun to add up; on November 6, 2013, WCS special education teacher Katy Hankins directed R.S.'s general education teachers to mark his final grades as "incomplete" for the first trimester.  (Id. at 26–28; P. Ex. 87.)  Also, by this time R.S.'s parents had retained legal counsel; their counsel contacted WCS on November 7.  (Doc. 55-1 at 26.)  On November 8, DPI notified the IEP team that it would not be sending a facilitator to the planned November 12 meeting because "[f]acilitation is an informal dispute resolution process" and "[n]ow that attorneys are being consulted, a new request for facilitation will need to be completed should those services be needed in the future."  (Id. at 26–27.)  R.S.'s parents never confirmed their attendance at the November 12 IEP meeting, and the meeting was never held.  (P. Ex. 70; Tr. Vol. 2 at 360.)

After school on December 2, 2013, R.S. had a panic attack at home and fell down a set of stairs, injuring himself.  (Doc. 57-1 at 28.)  His parents did not send him back to WCS following his fall, and December 2 proved to be his last day of attendance.  (Id. at 29.)  Mother notified WCS of his absences through December 10.  (Id. at 28.)  On December 11, Mother emailed Bryan the following:

19

"[R.S.] remains unable to attend. Further discussion regarding [R.S.'s] attendance need to be forwarded through the attorney for Woods Charter School and [our] attorney . . . ." (Id. at 28–29.) The parents received letters from Bryan in December 2013 and January 2014 regarding R.S.'s accumulation of unexcused absences.[11] (P. Exs. 89, 90.) Through the end of February, Hankins emailed R.S.'s homework and assignments to his parents; Smiley directed her to cease this practice on February 28, 2014. (P. Ex. 100; Tr. Vol. 11 at 2453.) On March 6, 2014, Bryan sent the parents a letter informing them that WCS was withdrawing R.S. from enrollment. (P. Ex. 94.)

## II. ANALYSIS

As discussed above, "[a] district court must review findings about the IDEA's legal requirements _de novo_." E.L., 975 F. Supp. 2d at 537. Although, as in this case, "a district court's review of IDEA administrative proceedings is typically conducted on motions for summary judgment, this is a procedural misnomer." Lorsson, 773 F.3d at 516. Instead, "the IDEA requires that a reviewing court . . . base its decision          on the preponderance of the evidence." Id. at 516–17 (emphasis omitted).

---

[11] The first letter was dated December 18, 2013, and stated that R.S. had "accumulated 6 or more unexcused absences." (P. Ex. 89.) Although the second letter was dated only two days later, December 20, 2013, it stated that R.S. had "accumulated 10 or more unexcused absences." (P. Ex. 90.) The parents did not receive the second letter until January 2014. (Id.; Doc. 55-1 at 29.)

This inquiry is generally twofold: "First, has the State complied with the procedures set forth in the [IDEA]?[12] And second, is the [IEP] developed through the [IDEA]'s procedures reasonably calculated to enable the child to receive educational benefits?" Rowley, 458 U.S. at 206-07.

Not every procedural violation of the IDEA constitutes a denial of FAPE:

> In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies (I) impeded the child's right to a [FAPE]; (II) significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child, or (III) caused a deprivation of educational benefits.

20 U.S.C. § 1415(f)(3)(E)(ii). The Supreme Court has cautioned that, "[i]n assuring that the requirements of the [IDEA] have been met, courts must be careful to avoid imposing their view of preferable educational methods upon the States." Rowley, 458 U.S. at 207. This is because "courts lack the 'specialized knowledge and experience' necessary to resolve 'persistent and difficult questions of educational policy'" or "methodology" — these questions should be left "for resolution by the States." Id. at 208 (quoting San Antonio Ind. Sch. Dist. v. Rodriguez, 411 U.S. 1,

---

[12] "This inquiry will require a court not only to satisfy itself that the State has adopted the state plan, policies, and assurances required by the [IDEA], but also to determine that the State has created an IEP for the child in question which conforms with the requirements of [the IDEA]." Rowley, 458 U.S. at 206 n.27.

21

42 (1973)).

Finally, the burden on each issue is "properly allocated to the party bringing the civil action to challenge the state administrative decision" — here the SRO's decision — as to that issue. Spielberg ex rel. Spielberg v. Henrico Cty. Pub. Sch., 853 F.2d 256, 258 n.2 (4th Cir. 1988).

## A. Statute of Limitations

As an initial matter, the court must determine whether North Carolina's one-year statute of limitations ("SOL") bars any of R.S.'s claims. The text of the SOL is as follows:

> Notwithstanding any other law, the party shall file a petition . . . that includes the information required under IDEA and that sets forth an alleged violation that occurred not more than one year before the party knew or reasonably should have known about the alleged action that forms the basis of the petition.

N.C. Gen. Stat. § 115C-109.6(b). The SOL also provides for narrow exceptions to the one-year rule:

> The one-year restriction . . . shall not apply to a parent if the parent was prevented from requesting the hearing due to (i) specific misrepresentations by the [LEA] that it had resolved the problem forming the basis of the petition, or (ii) the [LEA]'s withholding of information from the parent that was required under State or federal law to be provided to the parent.

Id. § 115C-109.6(c). The ALJ held that R.S.'s claims did not accrue until December 2, 2013, and therefore that nothing in his due process complaint — brought on October 31, 2014[13] — was time-

---

[13] The ALJ's opinion states that the due process complaint was filed on November 1, 2014. (Doc. 55-1 at 54.) However, a copy of the original

barred. (Doc. 57-1 at 54-55.) The ALJ also held, in the alternative, that the case fit the SOL exception in § 115C-109.6(c)(i). (Id.) The SRO, on the other hand, held that all claims based on "events that occurred and/or decisions that were made" prior to October 31, 2013 were barred by the SOL. (Doc. 57-2 at 26-27.)

The court first notes that neither party has argued that section 115C-109.6(b) is not actually an SOL, despite the fact that the statute does not expressly mention a time-to-file limitation. See Vlasaty v. Wake Cty. Pub. Sch. Sys. Bd. of Educ., No. 5:17-CV-578-D, 2018 WL 4515877, at *4 (E.D.N.C. Sept. 20, 2018) ("Plaintiffs respond that section 115C-109.6(b) is not a one-year statute of limitations because it says that a petition may allege only 'violation[s] that occurred not more than one year before the party knew or reasonably should have known about the alleged action that forms the basis of the petition,' but does not explicitly set a filing deadline." (citation omitted) (alteration in original)). Although, literally read, the statute does not appear to limit a petitioner's claims based on the filing date, the court will interpret it as an SOL consistent with the understanding of the administrative review officers below and the only other federal district courts to have considered it. See id. at *3-4; Karen M.

---

due process complaint included in the administrative record is stamped with a filing date of October 31, 2014.

*v. Bd. of Educ. for Cherokee Cty.*, No. 1:15cv48, 2015 WL 10490551, at *3-4 (W.D.N.C. Sept. 29, 2015); *P.L. ex rel. Liuzzo v. Charlotte-Mecklemburg Bd. of Educ.*, No. 3:07-CV-170-GCM, 2010 WL 2926129, at *4 (W.D.N.C. July 23, 2010) (error in original title).

Under this interpretation, the statute directs the court not to consider "alleged violation[s]" based on "alleged action[s]" a petitioner "knew or reasonably should have known about" over a year prior to filing his due process complaint. N.C. Gen. Stat. § 115C-109.6(b). The determinations of the ALJ and SRO are both misunderstandings of this rule, since neither officer considered which "alleged action[s]" the parents "knew or reasonably should have known about" before October 31, 2013. Instead, the ALJ determined that none of R.S.'s claims "accrued" until he stopped attending school after December 2, 2013,[14] and the SRO simply cut

---

[14] The ALJ cites *R.R. ex rel. R. v. Fairfax Cty. Sch. Bd.*, 338 F.3d 325 (4th Cir. 2003) for the proposition that IDEA claims do not accrue until a parent "reject[s] the proposed IEP as inadequate or withdr[aws the child] from the public school system." *Id.* at 332-33. *R.R.* is distinguishable, as it involved a Virginia SOL that simply provided that IDEA (and various other) cases "shall be brought within two years after the right to bring such action has accrued." Va. Code. § 8.01-248. The Fourth Circuit's determination of when an IDEA claim "accrues" under the Virginia SOL does not control the court's application of the North Carolina SOL, which specifically directs the court to consider when the various "alleged action[s]" that "form[] the basis of the petition" were known about (or reasonably should have been known about) by the petitioners. N.C. Gen. Stat. § 115C-109.6(b). Moreover, the court cannot square the ALJ's SOL determination that R.S.'s parents "withdrew [him] from the public school system," *R.R.*, 338 F.3d at 333, on December 2, 2013, with his determination elsewhere that it was in fact WCS that (improperly) withdrew R.S. from enrollment in March 2014. *Compare* (Doc. 55-1 at 54) *with* (*id.* at 48-50). Since R.S. points to many different incidents as bases for recovery under the IDEA, there is no single accrual date for his IDEA claim; instead, the court must weigh whether

24

off all actions that occurred before October 31, 2013, after determining that the parents knew or reasonably should have known generally "of violations of IDEA" before that date.[15]

The court further disagrees with the ALJ (and R.S., in briefing) that the SOL exception in § 115C-109.6(c)(i) applies to this case. See (Doc. 55-1 at 55; Doc. 55 at 31–32). The ALJ determined that the exception for "specific misrepresentations by the [LEA] that it had resolved the problem forming the basis of the petition" applies here because "WCS consistently represented to Petitioners that WCS was providing comparable services and seeking to develop an IEP for Student." (Doc. 55-1 at 55.) But WCS's attempts (whether successful or not) to live up to its IDEA obligations — and its communication of those attempts to R.S.'s parents — are not "specific misrepresentations" in which WCS somehow deceived R.S.'s parents as to particular actions its staff was taking. Instead, WCS and the parents appear to have simply disagreed on the questions of what "comparable services" entailed and how best the IEP team should proceed in developing a North

---

each alleged incident both passes the SOL bar and constitutes (on its own, or in combination with other incidents) a violation of the IDEA.

[15] While the SRO's version of the rule reaches the right result more often than not, there does appear to be at least one example of a series of actions occurring before October 31, 2013 that the parents did not know about (and could not reasonably have known about) until later. Specifically, R.S.'s gym teacher attempted to send information about his curriculum and R.S.'s performance in his class to the parents in both September and late October of 2013, but sent the email to the wrong addresses both times. (P. Ex. 78 at 959.)

Carolina IEP for R.S.

Pursuant to the foregoing analysis, the court will not consider incidents occurring before October 31, 2013, as bases for R.S.'s IDEA claims, unless there is evidence that the parents did not know and could not have reasonably known about them until after that date.[16]

## B. Whether WCS Failed to Provide Access to R.S.'s Educational Records

R.S. argues that Smiley's mistaken delivery of R.S.'s educational records to a special education teacher from the Chapel Hill-Carrboro City school system and subsequent decision to cause them to be shredded violates N.C. Gen. Stat. § 115C-109.3. That statute provides that LEAs "may release the records of a child with a disability only as permitted under State or federal law," and "shall provide an opportunity for the parents of a child with

---

[16] WCS argues that R.S.'s parents withdrew R.S. from school after December 2, 2013, and therefore that R.S. had no rights under the IDEA after that date. See (Doc. 53 at 10-11). As noted infra, R.S. was not withdrawn from school until WCS unilaterally disenrolled him in March 2014. See (P. Ex. 94). To the extent WCS argues that NC Policies § 1502-10 limits a disabled child's rights in the charter school context to the dates the child was physically "attend[ing]" a public charter school and argues that R.S. stopped attending WCS after December 2, 2013, the court is unconvinced that North Carolina intended to differentiate between the rights of a disabled child enrolled in a public charter school and the rights of a disabled child enrolled in any other LEA. In fact, the court finds that the policy provision at issue is a clear attempt to ensure that public charter schools cannot skirt the mandates of the IDEA, making them "responsible for ensuring that the requirements of these Policies are met" just like any other LEA. NC Policies § 1502-10(b); see also 34 C.F.R. § 300.209. As a result, because R.S. remained "enroll[ed]," NC Policies § 1503-4.4(f), at WCS after December 2, 2013, that date does not serve to cap his rights under the IDEA.

a disability to examine all records relating to that child." N.C. Gen. Stat. § 115C-109.3(a), (b). Having found that the SOL bars R.S.'s claims based on events the parents knew or should have known about prior to October 31, 2013, and because the parents became aware of the mistaken delivery and subsequent shredding of R.S.'s records by early September 2013 (P. Ex. 19 (email from Father to Smiley, dated September 5, 2013, indicating Father's knowledge "that a portion of the educational file had been sent to another school" and that it had been shredded)), the court finds this claim barred by the SOL.

### C. Whether WCS Provided Comparable Services, in Consultation with R.S.'s Parents

Section 1503-4.4(f) of the NC Policies, mirroring 20 U.S.C. § 1414(d)(2)(C)(i)(II), governs "IEPs for [disabled] children who transfer from another State." NC Policies § 1503-4.4(f). That section states that the transferee LEA "must provide the child with [a] FAPE" that "includ[es] services comparable to those described in the child's IEP from the previous public agency" until a North Carolina IEP is developed — and further that the LEA must do so "in consultation with the parents." Id.

As best the court can make out, R.S. argues that WCS failed to provide comparable services in three primary ways.[17] First, he

---

[17] R.S. is far from clear in articulating the bases on which he challenges WCS's provision of comparable services. In the section of his motion to dismiss brief entitled "Failure to provide Comparable services," he only specifies a single ground: WCS's provision of "pull-out" services

argues that WCS only provided speech and language services ("SLS") in a "pull-out" setting (i.e., outside the regular education classroom), when the PMSD IEP required that these services also be provided in a "push-in" or "total school environment" setting (i.e., within the regular education classroom),[18] and further that WCS ignored the SLS goals set out in the PMSD IEP. (Doc. 55 at 5, 24-25.) Second, he argues that WCS only provided him with "modified" physical education, when the PMSD IEP required "adaptive"[19] physical education. (Id. at 4-5; Doc. 61 at 6.) Third, he argues that WCS failed to provide adequate training in support of R.S.'s use of assistive technology. (Doc. 55 at 7;

---

[18] in lieu of services provided in the "total school environment." (Doc. 55 at 24-25.) In his response brief to WCS's motion to dismiss, he adds in passing that "the principal testified the school did not provide Adaptive Physical Education or training for the Livescribe pen." (Doc. 61 at 6.) He also briefly cites "examples in Plaintiffs' Corrected Memorandum of Law in Support of PMSJ" (id. at 7) in the facts section of his motion to dismiss brief, see (Doc. 55 at 4-8). The court has reviewed that facts section in determining the bases for R.S.'s challenge to WCS's provision of comparable services but discourages this haphazard briefing approach.

[18] R.S. argues at one point that "the PMSD IEP stated [R.S.] would receive all related services in the 'total school environment.'" (Doc. 55 at 25 (emphasis added).) To the extent R.S. means to challenge WCS's decision to provide occupational therapy by "pulling" R.S. from the regular classroom (id. at 6), this argument fails because the PMSD IEP clearly permits occupational therapy to be provided in a "Regular Education and/or Special Education" setting. (P. Ex. 24 at 387 (emphasis added).)

[19] Although R.S. repeatedly references "adaptive" physical education in his briefing, the court understands this to refer to "adapted" physical education, which is the term used in the PMSD IEP and defined in the NC Policies.

Doc. 61 at 6.)   In addition to these arguments, he also argues
that any comparable services WCS provided were not provided "in
consultation with the parents."   NC Policies § 1503-4.4(f); see
(Doc. 55 at 20–21.)

As to WCS's provision of SLS, the ALJ found that "[t]he PMSD
IEP called for SL[S] services to be provided in both the regular
education classroom as well as a separate setting," and WCS has
not challenged that interpretation of the PMSD IEP. (Doc. 55-1 at
15); see also (P. Ex. 24 at 387–98).  Neither has WCS challenged
the ALJ's finding that its contracted speech language pathologist,
Amy  Odom,  only  provided  SLS  outside  the  regular  education
classroom.[20]   See  (P. Exs. 74, 75).  The PMSD IEP also called for
SLS services "in the area of pragmatics," specifically regarding
"making inferences" and "interpreting ironic statements." (P. Ex.
24 at 369–70.)   R.S. argues that Odom focused too much on
"[t]opics[] such as 'idioms' and 'initiating conversation'"
instead of focusing on "pragmatics" and (specifically) irony.
(Doc. 55 at 5.)

The court finds these objections about WCS's methods for
delivering SLS to be insufficient to show that WCS did not provide

---

[20] WCS does argue that Odom attempted to have R.S. work on his "language
skills . . . in a naturalistic setting" by "scheduling R.S. to
participate in a 'Lunch Bunch' social skills group as part of his [SLS]."
(Doc. 60 at 11.)  R.S. declined to participate in the group.  (R. Ex.
57.)  While "Lunch Bunch" is not the sort of "pull-out" or "1:1" service
R.S. accuses WCS of limiting its SLS to, neither is it a provision of
SLS in "the regular education classroom."

"services comparable to those described" in the PMSD IEP, as required by NC Policies § 1503-4.4(f). R.S. relies on the Fourth Circuit's decision in Lorsson, arguing that it stands for the proposition that "there [i]s a distinction between services to be provided in the 'total school environment' and pull-out services." (Doc. 55 at 24); see 773 F.3d at 518. But although the Lorsson court does note the existence of both avenues of delivering SLS, it also expressly describes the difference between the two as merely "methodological." 773 F.3d at 518. As Lorsson itself points out, federal courts are to "afford great deference to the judgment of education professionals in implementing the IDEA. As long as an [IEP] provides the basic floor of opportunity for a special needs child, a court should not attempt to resolve disagreements over methodology." Id. at 517; see also Rowley, 458 U.S. at 208 ("[Q]uestions of methodology are for resolution by the States."). What's more: unlike in Lorsson, where the school was required to provide the services in its own IEP, here WCS was only required to provide "services comparable to those" in the PMSD IEP. NC Policies § 1503-4.4(f) (emphasis added). R.S.'s insistence that "pull-out" SLS is "distinct[]" from SLS provided in the "total school environment" (Doc. 55 at 24) does not show that the two SLS-delivery methods are not "comparable," and the court will not overturn "the judgment of education professionals" without good reason, Lorsson, 773 F.3d at 517. The court is

similarly reluctant to second-guess Odom's decision to cover topics like "idioms" and "body language" in her first few SLS meetings with R.S., especially when the record shows she quickly moved on to "inferences" and "irony" — the exact subjects highlighted in the PMSD IEP. R. Exs. 57, 58; see P. Ex. 24 at 369–70.[21]

As to WCS's provision of physical education, the ALJ found that R.S.'s gym teacher, Bryan Matthews, provided R.S. with modified physical education ("MPE") instead of the adapted physical education ("APE") called for in the PMSD IEP. (Doc. 55-1 at 19–20.) MPE "is appropriate for a child who can participate in the general physical education program with accommodations or modifications," whereas APE "is instruction in physical education that is designed on an individual basis specifically to meet the needs of a child with a disability." NC DPI Policies § 1500-

---

[21] Although the court disagrees with the SRO that the ALJ's opinion is so flawed that its factual findings are not due a presumption of correctness, the court here identifies a specific instance in which one of the ALJ's factual findings is "clearly contradicted by the record." (Doc. 55-2 at 9.) Despite the fact that R.S.'s special education expert — whom the ALJ credited (Doc. 55-1 at 19-20) — testified that "pragmatics" is "the social part of language" and includes "understanding . . . iron[y]" and "reading body language" (Tr. Vol. 3 at 622), and the fact that Odom's SLS log expressly catalogues work on "social lang[uage]," "irony," and "body language," (R. Ex. 57), the ALJ found that Odom's "log shows no work on 'pragmatics.'" (Doc. 55-1 at 15.) The court finds the record evidence sufficient to defeat the *prima facie* correctness ascribed to the ALJ's factual finding on this matter, and instead finds that Odom's log does show work with R.S. on pragmatics. (R. Ex. 57); see also (R. Ex. 58 (Odom describing R.S.'s "progress" in "irony and sarcasm" and then expressing "anticipat[ion of] continued progress in the area of pragmatic communication skill development")).

2.1(c), (d). APE can be either "a direct service" by a specialist or "[c]onsultative, meaning that the specialist will be consulting with a regular educator." (Tr. Vol. 3 at 631.)

The record supports the ALJ's finding that WCS only provided MPE, as Matthews — who is not an APE specialist (Tr. Vol. 1 at 93) — testified that R.S. was provided physical education "[w]ithin our regular curriculum," with "modifications" wherever R.S. "had trouble" (id. at 96, 99). Although Matthews did eventually consult with Pat Hurlman, an outside APE specialist, several months into the school year, he testified that he never implemented Hurlman's recommendations (P. Ex. 78 at 957-58) because R.S. "stopped coming" to Matthews' class sometime around November. (Tr. Vol. 1 at 105-09.)

The only question, then, is whether MPE is "comparable" to APE in this context. Unlike with WCS's provision of SLS, where the school provided the service specified in the PMSD IEP and R.S. only contested the school's methodology, here WCS manifestly did not provide the service (APE) specified in the PMSD IEP. And the school's "plan . . . to have Pat Hurlman come in and consult and perhaps . . . do lessons with R.[S.]" (id. at 105) is at least some evidence that WCS was concerned that the MPE Matthews was providing was not sufficiently comparable to the APE required by the PMSD IEP. The school has also not provided an explanation for its delay in attempting to provide APE — Hurlman was not brought

32

in to observe R.S. until the latter part of October, and Matthews had not "put [Hurlman's recommendations] in place" at least through the beginning of November. (Id. at 109.) While some minor delay in providing comparable services might be reasonable as WCS attempted to adapt its resources to best implement the services called for in the out-of-state IEP, delaying provision of APE through November seems unreasonable. Although the question is a close one, the court finds that the evidence supports R.S.'s argument that WCS did not provide him with comparable services in the area of physical education.[22]

R.S also argues that WCS failed to provide training in support of his use of assistive technology. Specifically, he argues that "principal [Bryan] testified the school did not provide . . . training for the Livescribe pen."[23] (Doc. 61 at 6.) The ALJ found that "Father expressed concerns" regarding R.S.'s "lack of support for assistive technology" in a September 17, 2013 email to Hankins, and that R.S.'s October 3, 2013 request that he "practice the use

---

[22] As noted in footnote 15, supra, Matthews attempted to send information about his class to R.S.'s parents on September 10, 2013, but sent the email to the wrong address. (P. Ex. 78 at 959.) Matthews again attempted to send the information on October 24, 2013, but again appears to have sent it to the wrong email addresses. (Id.) Since there is no evidence that R.S.'s parents knew or should have known that WCS was not providing APE before October 31, 2013, R.S.'s claims regarding comparable physical education services are not barred by the North Carolina SOL. See N.C. Gen. Stat. § 115C-109.6(b).

[23] A Livescribe pen is a digital recording device that records what it writes for later review on a computer and synchronizes the writing with audio it also records.

33

of the Livescribe pen" during an occupational therapy session was rebuffed. (Doc. 55-1 at 17, 20); <u>see</u> (P. Ex. 77 at 831; R. Ex. 55). The ALJ also found that R.S. received training with the Livescribe pen beginning in late October and running through December 2, R.S.'s last day of attendance at WCS. (Doc 55-1 at 21-22, 28); <u>see also</u> (P. Ex. 130; R. Ex. 52).

Although the school did not begin Livescribe pen training until October, this appears to have been due to the fact that the Livescribe pen — which WCS did not have on hand when R.S. enrolled — had not yet arrived as of September 19, 2013. (P. Ex. 44.) At any rate, R.S.'s parents were aware prior to late October that the school had not yet begun training R.S. with the Livescribe pen (P. Ex. 44), and therefore any claim based on that fact is barred by the North Carolina SOL. N.C. Gen. Stat. § 115C-109.6(b). And R.S. has not explained why WCS's assistive technology training sessions beginning in late October (R. Ex. 52) were so deficient that they amounted to a failure to provide comparable services. Finally, R.S.'s assertion that "principal [Bryan] testified the school did not provide . . . training for the Livescribe pen" (Doc. 61 at 6) is a misrepresentation of Bryan's testimony, which was as follows:

> Q: "Do you know when Woods Charter School began training R.[S.] with the Livescribe pen?"
>
> A: "I do not."

34

Q: "Do you believe that they started training him with the Livescribe pen in August of 2013?"

A: "I don't know.  I don't think so."

Q: "So at that time that comparable service was not being provided?"

A: "That's correct."

(Tr. Vol. 13 at 2836–37.)  Neither Bryan's statement that he did not know when R.S.'s Livescribe pen training began nor his statement that WCS did not provide training in August 2013 can be construed as a statement that WCS "did not provide . . . training for the Livescribe pen" (Doc. 61 at 6) at all.  As previously stated, it is clear that WCS did not provide Livescribe pen training in August, since the Livescribe pen had not yet arrived (P. Ex. 44), but — even if WCS was to blame for not having a Livescribe pen already on hand when R.S. started school — any claim based on a lack of training in August is barred by the North Carolina SOL.

In summary, WCS provided services comparable to those in the PMSD IEP in the areas of SLS and assistive technology training,[24] but not in the area of physical education.  This leaves R.S.'s

---

[24] R.S. repeatedly asserts that WCS's failure to "reduce comparable services to writing" early on in his time at WCS is evidence that comparable services were not provided.  (Doc. 61 at 6); see (Doc. 55 at 21, 25).  As WCS points out, R.S. offers no authority for the proposition that an LEA must — or should — create a separate document listing comparable services rather than having teachers and staff work directly off the out-of-state IEP.

claim that WCS failed to provide comparable services "in consultation with the parents." NC Policies § 1503-4.4(f); <u>see</u> (Doc. 55 at 20–21). The court can resolve this claim quickly, as the ALJ's findings and record of exhibits are replete with instances of consultation between WCS and R.S.'s parents, including an early meeting between the parents, Smiley, and Principal Bryan. <u>See, e.g.,</u> (Doc. 55-1 at 15–18; P. Exs. 44, 77). The fact that Smiley also met separately with some of R.S.'s teachers "to discuss comparable services" on September 13, 2013 (Doc. 55-1 at 37), does not show otherwise; the requirement that the school consult with the parents in the provision of comparable services is not a blanket prohibition on intra-staff meetings discussing comparable services.[25]

## D. Whether WCS Violated the IDEA by Holding an IEP Meeting Without R.S.'s Parents

At the IEP team's first meeting, on October 28, 2013, the team scheduled their second meeting to be held via telephone at 12:30 p.m. on November 1, 2013. (R. Ex. 37.) WCS sent a reminder of the meeting to the parents on October 30, 2013. (R. Ex. 41.) Also, on October 30, 2013, WCS notified the parents that the DPI facilitator would be unable to attend the November 1 meeting. (R.

---

[25] Furthermore, WCS immediately relayed the gist of the September 13, 2013 meeting to the parents in an email informing them that R.S.'s "teachers have all met . . . to review R.[S.]'s IEP" and "[t]hey have been given a copy of his IEP accommodations" as well as "articles about [Non-Verbal Learning Disability]." (R. Ex. 9.)

Ex. 43.)  At 9:50 a.m. on November 1, Father emailed WCS, stating that he "believe[d] the non-facilitated phone conference WCS has proposed for today should be reconsidered" in light of the lack of a facilitator.  (Id.)  Smiley sent a reply email, stating that WCS "would like to continue the meeting at 12:30 pm as planned."  (Id.)  At 12:12 p.m., Father responded that "[a] phone conference as proposed for today will not afford opportunity to address these high priority matters as they seem to require."  (P. Ex. 61 at 583.)  At 12:30 p.m., WCS initiated the meeting by telephone; Smiley called Father, but he failed to answer.  (Tr. Vol. 10 at 2088; R. Exs. 44, 46.)  WCS continued the meeting without Father, ultimately finalizing documents finding R.S. eligible for special education services in the categories of "Specific Learning Disability" and "Speech Impairment."  (R. Exs. 44, 49.)  Smiley sent these documents to the parents, including a draft IEP.  (Doc. 55-1 at 25.)

R.S. argues that WCS's decision to hold the November 1 IEP meeting without the parents amounts to a procedural violation of the IDEA in that it denied the parents their right to participate in the IEP development process.  WCS responds that the IDEA only requires that it provide the parents with "the opportunity to participate" at IEP meetings and claims that it did so.  (Doc. 60 at 7.)

37

"The core of the [IDEA] . . . is the cooperative process that it establishes between parents and schools," and "[t]he central vehicle for this collaboration is the IEP process." Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 53 (2005). To that end, the IDEA requires that parents be included in the IEP team. 20 U.S.C. § 1414(d)(1)(B). The North Carolina policy on parent attendance at IEP meetings — lifted directly from 34 C.F.R. 300.322(a) — is that the "LEA must take steps to ensure that one or both of the parents of a child with a disability are present at each IEP Team meeting or are afforded the opportunity to participate." NC Policies § 1503-4.3(a). This includes "[n]otifying the parent(s) of the meeting early enough to ensure that they will have the opportunity to attend" and "[s]cheduling the meeting at a mutually agreed on time and place."[26] Id. In the event that the LEA is "unable to convince the parent(s) that they should attend," the "meeting may be conducted without a parent in attendance." Id. § 1503-4.3(d).

The court finds that WCS did provide R.S.'s parents with "the opportunity to participate" in the November 1 IEP meeting, as

_____

[26] North Carolina also requires that "[i]f neither parent can attend an IEP Team meeting, the public agency must use other methods to ensure parent participation, including individual or conference telephone calls." NC Policies § 1503-4.3(c). R.S.'s parents do not argue that they could not have attended the meeting; rather, they appear to have simply refused to answer the phone. (P. Ex. 61 at 583–84; Tr. Vol. 10 at 2088; R. Exs. 44, 46.) Either way, WCS did attempt to use telephone calls to ensure Father's participation. (Tr. Vol. 10 at 2088; R. Exs. 44, 46.)

required under the IDEA.  The parents were notified of the meeting in advance, and the meeting time was mutually agreed upon by the IEP team at the October 28 meeting — including the parents.  (R. Exs. 37, 38.)  There is no evidence that the parents faced any difficulties in attending the November 1 meeting, and R.S. does not make any argument to that effect.  Instead, Father appears to have simply refused to answer the telephone, apparently because the parents didn't want IEP meetings to be held without a DPI facilitator.  (R. Exs. 43, 44, 46; Tr. Vol. 10 at 2088.)  But there is no legal requirement that a facilitator be present at IEP meetings, and Smiley specifically informed R.S.'s parents that the meeting would proceed as scheduled without the facilitator.  (R. Ex. 43.)  In light of WCS's impending deadline to prepare an IEP, and since WCS complied with the policies governing parent participation at IEP meetings — policies that allow schools to "[c]onduct[] an IEP meeting without a parent in attendance" when the parents refuse the opportunity to participate — the court finds that WCS did not procedurally violate the IDEA by holding the November 1 IEP meeting.[27]

---

[27] R.S. also briefly argues that WCS failed to provide the required prior written notice before various meetings.  (Doc. 55 at 25-26.)  Although R.S. takes issue with "numerous occasions" on which WCS did not acquiesce to the parents' demands for more information/documentation, WCS was only required to provide prior written notice if it acted to "change the identification, evaluation, or educational placement of the child."  NC Policies § 1504-1.4(a).  The only such action WCS took at a meeting was its eligibility determination at the November 1 IEP meeting (to be implemented on November 4), and the court finds that WCS provided prior

## E. Whether WCS Violated the IDEA by Failing to Timely Develop an IEP for R.S.

WCS had developed a draft IEP by November 1, 2013, and scheduled a third IEP meeting for November 12 in the apparent hope of moving towards finalization. See (P. Ex. 79 at 1000; R. Ex. 45). The DPI facilitator was originally scheduled to attend the November 12 meeting. (P. Ex. 79 at 998.) On November 8, in response to a follow-up email from DPI requesting confirmation of the November 12 meeting, the parents wrote: "Our answer will be forthcoming through our attorney. It appears that our attorney has a scheduling conflict, and we want him to attend." (Id. at 1007.) DPI responded with the following:

> The school will also have the opportunity to invite it's [sic] attorney. Therefore, in order for all parties to appropriately plan, I am going to make the assumption that a new meeting will need to be scheduled at a mutually agreeable time. I will be cancelling the facilitator for Tuesday. Facilitation is an informal dispute resolution process. Now that attorneys are being consulted, a new request for facilitation will need to be completed should those services be needed in the future.

(Id. at 1008.) The November 12 IEP meeting was never held, and WCS points to no record evidence of any attempts to reschedule it

---

written notice of that action in compliance with NC Polices § 1504-1.4. See (R. Ex. 50). Even if WCS could be said to have procedurally violated the IDEA because of some failure to adequately involve the parents in (or provide notice for) the November 1 IEP meeting, that procedural violation would be essentially harmless, since WCS never completed or implemented an IEP for R.S. anyway. That failure, as explained below, is its own violation of the IDEA.

or to hold any further IEP meetings.

R.S. urges the court to adopt the conclusion of both the ALJ and the SRO that WCS violated the IDEA by failing to complete an IEP for him. WCS's position is somewhat conflicting: although it argues in places that "there is no IDEA violation regarding the timely development of an IEP for R.S.," (Doc. 53 at 21) it rests its case entirely on MM ex rel. DM v. Sch. Dist. of Greenville Cty., 303 F.3d 523 (4th Cir. 2002), in which the Fourth Circuit endorsed the district court's determination that "it would be improper to hold [the] School District liable for the procedural violation of failing to have the IEP completed and signed, when that failure was the result of [the parents'] lack of cooperation." Id. at 535 (alterations in original). If this case is analogous to MM, as WCS argues, then its statement that "there is no IDEA violation regarding the timely development of an IEP for R.S." evinces a misunderstanding of MM. The MM court found that the school's failure to timely implement an IEP was a "clear" violation of the IDEA. Id. at 533. Nevertheless, since that violation was a "procedural" one, the Fourth Circuit went on to "assess whether it resulted in the loss of an educational opportunity for the disabled child, or whether, on the other hand, it was a mere technical contravention of the IDEA" — ultimately settling on the latter. Id. A procedural violation of the IDEA does not make a school liable for "reimbursement relief" unless the violation

41

"actually interfere[s] with the provision of a FAPE."  DiBuo ex
rel. DiBuo v. Bd. of Educ. of Worcester Cty., 309 F.3d 184, 190–
91 (4th Cir. 2002).  Given its reliance on MM, WCS's properly-
stated position is not that "there is no IDEA violation regarding
the timely development of an IEP for R.S." (Doc. 53 at 21), but
that R.S. has not "prov[en] a denial of FAPE through the
[procedural] failure to timely develop an IEP for R.S." (id.).

Absent any argument the other way, the court has little
difficulty finding that WCS procedurally violated the IDEA by
failing to timely develop an IEP for R.S.  The IDEA requires that
LEAs conduct an initial evaluation to determine whether a child
has a disability "within 60 days of receiving parental consent for
the evaluation, or, if the State establishes a timeframe within
which the evaluation must be conducted, within such timeframe."
20 U.S.C § 1414(a)(1)(C)(i)(I).  Once an initial evaluation shows
that the child needs special education, LEAs must ensure that "[a]
meeting to develop an IEP . . . is conducted within 30 days."  34
C.F.R. § 300.323(c)(1).  North Carolina combines these deadlines,
requiring under its IDEA policies that "[e]valuations must be
conducted, eligibility determined, and for an eligible child, the
IEP developed, and placement completed within 90 days of receipt
of a written referral."  NC Policies § 1503-2.2(c)(1).  The
policies list three exceptions to the 90-day timeline: (1) "[t]he
parent of a child repeatedly fails or refuses to produce the child

42

for the evaluation," (2) "[t]he parent of a child repeatedly fails or refuses to respond to a request for consent for the evaluation," or (3) "[a] child enrolls in a school of another LEA after the 90-day timeline has begun, and prior to determination by the child's previous LEA as to whether the child is a child with a disability." Id. § 1503-2.2(d).

R.S. asserts that the 90-day clock started ticking on his first day of school, August 20, 2013. WCS does not argue otherwise, although it mentions completion of a "referral" in the form of a "DEC 1" at the November 1, 2013 meeting. (Doc. 62 at 8; R. Ex. 46.) Principal Bryan testified that "one could interpret the time of referral as when [the school] know[s] that the child has an IEP," but that "[a]nother time of referral would be at the completion of a DEC 1." (Tr. Vol. 13 at 2771.) Nevertheless, the evidence shows that DPI advised WCS that the 90-day timeframe started with R.S.'s first day of school and that the entire IEP team ultimately agreed with that interpretation. (Id.; P. Ex. 162; R. Ex. 37.) In the absence of any argument from WCS that DPI's interpretation of its policy is an improper one, the court will assume for purposes of this analysis that R.S. was referred for a disability evaluation as of August 20, 2013, when WCS had notice of his then-current PMSD IEP and of his parents' wish that

43

he get a WCS IEP for the 2013–2014 school year.[28]

Given the forgoing analysis, WCS was required to have developed R.S.'s IEP and completed his placement by November 17, 2013. It did not do so. Nor is there any argument that one of the formal exceptions to the 90-day timeline, as laid out in section 1503-2.2(d) of the North Carolina policies, applies here. Instead, WCS argues only that the parents' failure to cooperate in the IEP process precludes actual IDEA liability for its procedural violation under the Fourth Circuit's decision in <u>MM</u>. The court will treat that question along with WCS's other procedural violations at the conclusion of the opinion, and therefore simply finds for now — in agreement with both the ALJ and the SRO — that WCS violated the IDEA by failing to timely develop an IEP for R.S.

### F. Whether WCS Violated the IDEA by Disenrolling R.S.

After school on December 2, 2013, R.S. fell down a set of stairs at home, injuring himself. (Doc. 57-1 at 28.) His parents did not again send him to WCS for the remainder of the 2013–2014 school year. (<u>Id.</u> at 29.) Although they notified WCS of R.S.'s absences through December 10, they ceased giving any such notices after a December 11 email, stating: "[R.S.] remains unable to

---

[28] WCS was in fact on notice of R.S.'s special education status and the parents' intent that he have a North Carolina IEP even before that date, as evidenced by the parents' email correspondence with Smiley. However, R.S.'s rights under the IDEA in relation to WCS did not kick in until he enrolled and began "attending [a] charter school[]" on August 20, 2013. 20 U.S.C. § 1413(a)(5); <u>see</u> 34 C.F.R. 300.209.

attend. Further discussion regarding [R.S.'s] attendance need to be forwarded through the attorney for Woods Charter School and [our] attorney . . . ." (Id. at 28–29.) Bryan sent the parents letters in the ensuing months regarding R.S.'s accumulation of unexcused absences. (Id.) Until late February, Hankins emailed R.S.'s homework and assignments to his parents, but Smiley directed her to cease this practice on February 28, 2014. (Tr. Vol. 11 at 2453; P. Ex. 100.) On March 6, 2014, Bryan sent a letter informing the parents that WCS was withdrawing R.S. from enrollment after "49 consecutive unexcused absences." (P. Ex. 94 at 1100.)

R.S. argues that WCS violated the IDEA by failing to determine whether his unexcused absences were a "manifestation" of his disability. (Doc. 55 at 28–31); 20 U.S.C. § 1415(k)(1)(E). WCS responds that it did not disenroll R.S. for "disciplinary" reasons, and therefore was not required to make a "manifestation determination" under the IDEA. (Doc. 60 at 20–21.) WCS also argues that it did not need to provide prior written notice of the disenrollment because — prior to Bryan's letter on March 6, 2014 — R.S.'s parents had already effectively disenrolled him by "enroll[ing] him in their home school." (Doc. 53 at 25.)[29]

_____

[29] The parties also devote significant briefing to whether WCS disenrolled R.S. pursuant to various North Carolina laws and regulations. R.S. argues that WCS disenrolled him pursuant to North Carolina's "Ten Day Rule" (P. Ex. 181) and/or "Compulsory Attendance Law," N.C. Gen. Stat. § 115C-378, and WCS argues that its disenrollment decision was unrelated to either. This quarrel has little bearing on whether WCS improperly disenrolled R.S. under the IDEA.

The IDEA requires that, "within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct," the LEA and IEP team must determine whether "the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability" or "was the direct result of the local educational agency's failure to implement the IEP." 20 U.S.C. § 1415(k)(1)(E)(i). The IDEA also requires the following:

> Written notice that meets [certain] requirements . . . must be given to the parents of a child with a disability a reasonable time before the LEA --
>
> (1) Proposes to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child; or
>
> (2) Refuses to initiate or change the identification, evaluation, or educational placement of the child or the provision of FAPE to the child.

NC Policies § 1504-1.4(a); see 20 U.S.C. § 1415(b)(3). The written prior notice must provide a detailed explanation of the LEA's intended action and its reasoning, in compliance with NC Policies § 1504-1.4(b). See 20 U.S.C. § 1415(c)(1).

As to the manifestation determination, the court agrees with WCS (and the SRO) that R.S. has failed to show that he was disenrolled "because of a violation of a code of student conduct," and has therefore failed to show that WCS owed him a manifestation

46

determination.[30]  Although WCS's student code of conduct provides that "[t]ruancy or skipping class" is a conduct violation, the code does not provide for disenrollment as a possible consequence. (P. Ex. 2 at 21 (stating that the consequences for "[t]ruancy or skipping class" include referral to the principal, notifying the parents, detention, and suspension).)  WCS never mentioned the code of conduct in its disenrollment letter, and there is no evidence that WCS was treating R.S.'s absences as a violation of the student code of conduct.  In all likelihood, the terms "truancy" and "skipping class" in the code of conduct are meant to refer to student-initiated misconduct — not a parental choice to keep a child at home.

As to the prior written notice requirement, however, the court agrees with R.S. (and, again, the SRO).  Disenrollment is a "change" in "educational placement," triggering the prior written notice requirement.  NC Policies § 1504-1.4(a); see R.B. ex rel. Parent v. Mastery Charter Sch., 762 F. Supp. 2d 745, 758 (E.D. Pa. 2010) ("Like a graduation, indefinite suspension, or expulsion, the unilateral disenrollment of a special education student, which results in the absolute termination of a child's special education

---

[30] The SRO found that WCS did not owe R.S. a manifestation determination, but that WCS owed — and failed to provide — prior written notice.  Since the burden on each issue is "properly allocated to the party bringing the civil action to challenge the state administrative decision," Spielberg, 853 F.2d at 258 n.2, the burden as to R.S.'s disenrollment is split: R.S. has the burden as to the manifestation determination and WCS has the burden as to the prior written notice issue.

program, and purportedly the termination of a LEA's responsibility to deliver FAPE, is a change in placement.").[31]  And although WCS sent R.S. a number of letters regarding his absences, none of these comes anywhere close to including the information required for compliant prior written notice.  Compare NC Policies § 1504-1.4(b) with (R. Exs. 63–66).

WCS's argument that R.S.'s parents had already disenrolled him by enrolling him in in a home school is a closer question; however, the court finds that WCS has failed to show that R.S. was actually enrolled in a home school prior to Bryan's March 6, 2014 disenrollment letter.  The school's only evidence of R.S.'s alleged homeschooling is a document — admittedly entitled "Home School Attendance Record" — on which Mother kept track of R.S.'s school days beginning February 3, 2014.  (P. Ex. 105 at 1159.)  But Mother strenuously denied ever enrolling R.S. in a home school prior to his disenrollment from WCS, testifying that she was simply keeping

---

[31] WCS takes issue with R.S.'s reliance on Mastery on the manifestation determination issue, arguing that the Mastery court "did not hold that a unilateral disenrollment constituted a disciplinary removal that required a manifestation determination." (Doc. 60 at 21.)  Since this court found above that WCS did not disenroll R.S. "because of a violation of a code of student conduct," it need not look to Mastery for that purpose.  Instead, the court merely agrees with Mastery on the proposition that unilateral disenrollment constitutes a "change" in "educational placement" under the IDEA.  762 F. Supp. 2d at 758.  WCS has offered no argument — nor can the court imagine one — that disenrolling a child from school should not constitute a "change" in "educational placement."  Id. at 759 ("[N]o change in placement seems quite so serious nor as worthy of parental involvement and procedural protections as the termination of placement in special education." (quoting Cronin v. Bd. of Educ. of E. Ramapo Cent. Sch. Dist., 689 F. Supp. 197, 203 (S.D.N.Y. 1988)).

48

track of the days R.S. was doing the work WCS was sending home. (Tr. Vol. 11 at 2453–55.) WCS regularly sent R.S.'s work home through the end of February. See id.; (P. Ex. 100).

North Carolina requires a variety of actions on the part of the parent or guardian before a child may be formally homeschooled (P. Ex. 105 at 1162), and there is no evidence of Mother taking any of these actions for R.S. Instead, the evidence better supports the conclusion that Mother was formally homeschooling R.S.'s younger sibling for the 2013–2014 school year and used the attendance charts she already had on hand to keep track of when R.S. was doing his WCS work at home. (Id. at 1160; Tr. Vol. 11 at 2453–55.) The parents had previously notified the school that they were interested in placing R.S. in "homebound instruction" status, under which a North Carolina public school continues to "provide instruction" for a student who is "unable to attend school" (P. Ex. 181); this appears to be what the parents were attempting for R.S. in early 2014. (Tr. Vol. 11 at 2453–55; Tr. Vol. 13 at 2897.) Although R.S.'s case would be better had the parents actually succeeded in placing R.S. in "homebound instruction" status by filling out the proper paperwork (R. Ex. 66), the court ultimately finds that the attendance document[32] is

---

[32] Mother also testified that the attendance document in evidence was not even filled out during the 2013–2014 school year; rather, it was a "clean copy" she produced in July 2014 based on the "working copy" she kept during the year. (Tr. Vol. 11 at 2455.) The document is in fact dated "7/25/2014." (Doc. 105.)

49

insufficient evidence that R.S.'s parents formally enrolled him in a home school prior to WCS's March 6, 2014 decision to disenroll him.

As a result, the court finds that WCS violated the IDEA by failing to provide prior written notice — in a manner compliant with NC Policies § 1504-1.4(b) — of their decision to disenroll R.S.

### G.  Whether WCS's Procedural Violations of the IDEA Constitute a Denial of FAPE

Having found three violations on the part of WCS — failure to provide comparable services in the area of physical education; failure to timely develop an IEP; and failure to provide prior written notice of disenrollment — the court turns to whether these violations constitute a denial of FAPE.[33]  Under the IDEA, "a violation of a procedural requirement of the IDEA (or one of its implementing regulations) must actually interfere with the provision of a FAPE [ { "pageset": "Sac... before the child and/or his parents

---

[33]  Although the IDEA differentiates between "substantive" and "procedural" violations, it does not explain how courts are to classify a given violation.  20 U.S.C. 1415(f)(3)(E); see A.K. ex rel. J.K. v. Alexandria City Sch. Bd., 484 F.3d 672, 684 (4th Cir. 2009) (Gregory, J., dissenting) ("There is no bright line distinguishing all the 'procedural' requirements of the IDEA from its 'substantive' requirements."); Jon Romberg, The Means Justify the Ends: Structural Due Process in Special Education Law, 48 Harv. J. on Legis. 415, 430 (2016) ("[M]uch confusion remains about the difference between a procedural and a substantive violation [of the IDEA].").  In the present case, while the court assumes that WCS's violations are procedural, it is immaterial to the outcome as the court finds that those violations resulted in a loss of educational opportunity for R.S.

[are] entitled to reimbursement." DiBuo, 309 F.3d at 190-91. A procedural violation must "impede[] the child's right to a [FAPE]," "significantly impede[] the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE]," or "cause[] a deprivation of educational benefits" before it amounts to an actual denial of FAPE. 20 U.S.C. § 1415(f)(3)(E)(ii).

As to its failure to provide comparable services in the area of physical education, WCS offers no argument why such a violation should not constitute a denial of FAPE.[34] As to its failure to timely develop an IEP for R.S., WCS argues — as explained previously — that the parents' failure to cooperate in the IEP process relieves it of liability under the Fourth Circuit's decision in MM. To reiterate, the MM court affirmed the district court's conclusion that "it would be improper to hold [the] School District liable for the procedural violation of failing to have the IEP completed and signed, when that failure was the result of [the parents'] lack of cooperation." 303 F.3d at 535 (alterations in original).

To be sure, the record demonstrates that at several points R.S.'s parents complicated, if not frustrated, the IEP development

---

[34] WCS only argues that it did indeed provide comparable physical education services. That argument is treated (and rejected) earlier in this opinion.

process. But even if WCS felt hampered in its efforts to comply with the mandates of the IDEA, the parents' actions simply do not rise to the level of relieving WCS of liability for failing to develop an IEP for R.S. Unlike in MM, where the parents "cancelled a scheduled third [IEP] meeting" and ignored the schools' request that they provide "notification . . . when they were ready to reconvene the IEP Team," id. at 534, R.S.'s parents merely notified WCS that their "attorney ha[d] a scheduling conflict" with the third IEP meeting and that they "want[ed] him to attend." (P. Ex. 79 at 1007.) There is no evidence that WCS attempted to reschedule the IEP meeting, or — as the school district did in MM — asked the parents to notify them when they wished to hold another IEP meeting. The parents had the right to include an attorney with the IEP team at their discretion, and WCS does not explain why it could not have worked with the parents and their attorney to find a mutually agreeable meeting time. See 34 C.F.R. § 300.321(a)(6) (the LEA "must ensure" — "[a]t the discretion of the parent" — "that the IEP Team for each child with a disability includes . . . other individuals who have knowledge or special expertise regarding the child"); see also Ruth E. Ryder, Acting Dir., Office of Special Educ. Programs, U.S. Dep't of Educ., Letter to Andel, 67 IDELR 156 (2016) (noting that "a parent's right to invite an individual of his or her choosing" to an IEP meeting includes the choice to have "an attorney accompan[y] the parent to the

meeting"). In light of the lack of evidence that WCS seriously attempted to hold further IEP meetings, the court is unconvinced that WCS "ha[d its] hands tied" (Doc. 60 at 10) to such an extent that it should not be held liable for its failure to timely develop an IEP for R.S.[35]

As to its failure to provide prior written notice of its decision to disenroll R.S., WCS argues that the court should adopt the SRO's conclusion that WCS did not deny R.S. a FAPE through its failure to provide prior written notice of disenrollment because "[t]he Parents had clearly made the decision not to make [R.S.] available to receive any educational opportunity or benefits that WCS may have chosen to provide after December 2, 2013." (Doc. 55-2 at 32.) The court disagrees. Although the parents did not take the proper steps to place R.S. in "homebound instruction" status at WCS, as outlined earlier in this opinion, Mother's uncontroverted testimony was that WCS was "still supplying [R.S.'s] homework" prior to the disenrollment and that she was "utilizing the work that was being sent from [WCS]" to "keep [R.S.] grade level appropriate." (Tr. Vol. 11 at 2453–54.) Had WCS provided prior written notice that it planned to disenroll R.S.,

---

[35] Furthermore, as the SRO points out, it is unclear why WCS waited so long to begin holding IEP meetings. (Doc. 55-2 at 35.) Had the school not delayed holding R.S.'s first IEP meeting until late October — over two months into the school year — perhaps it would not have had such difficulty attempting to squeeze all the necessary IEP meetings into the few weeks remaining before the 90-day deadline.

perhaps the parents would have followed up on their earlier expressed interest in formally placing R.S. in "homebound instruction" status, see (Tr. Vol. 13 at 2897), or taken some other action to keep him at WCS for the remainder of the school year. Either way, Mother's testimony is evidence that R.S. was still receiving "educational benefits" from his enrollment at WCS in the form of the schoolwork that WCS was sending home for him; WCS "depriv[ed]" R.S. of those benefits by disenrolling him. 20 U.S.C. § 1415(f)(3)(E)(ii)(III).

In conclusion, then, the court finds that WCS's IDEA violations "actually interfered with the provision of a FAPE" and that WCS therefore owes R.S. compensatory education. DiBuo, 309 F.3d at 190.

### H. Award

The IDEA directs district courts to "grant such relief as the court determines is appropriate," 20 U.S.C. § 1415(i)(2)(C)(iii) — language that the Supreme Court has interpreted as "confer[ring] broad discretion on the court." Burlington, 471 U.S. at 369. This relief most commonly takes the form of "parental reimbursement for private placements" undertaken while a school was denying the child a FAPE, M.S. ex rel. Simchick v. Fairfax Cty. Sch. Bd., 553 F.3d 315, 323 (4th Cir. 2009), or prospective "compensatory education" to make up for "past deficien[cies]" on the part of the school, Fort Bragg, 343 F.3d at 308; see also Mark C. Weber, Special

54

Education Law and Litigation Treatise § 22.3(6) (4th ed. 2017) ("Compensatory education may take the form of compensatory related services."). "[C]ompensatory and punitive damages are generally unavailable under the [IDEA]." Sellers ex rel. Sellers v. Sch. Bd. of Manassas, 141 F.3d 524, 528 (4th Cir. 1998). Attorneys' fees, meanwhile, "are available to prevailing parents as a matter of course." Weber, supra, § 23:1; see 20 U.S.C. § 1415(i)(3)(B) (authorizing "reasonable attorneys' fees" awarded "to a prevailing party who is the parent of a child with a disability").

The parties' positions on the proper award in this case are ambiguous. WCS puts all its eggs in the basket of no liability, and thus offers no argument as to how the court should determine the appropriate remedy when it does make a finding of liability. As for R.S., he states in one place that "the ALJ's ruling [awarding] compensatory education should be reinstated," but appears to urge elsewhere that the court "award . . . a monetary amount consistent with private school tuition" so that the parents can "recover[] . . . damages" for WCS's denial of FAPE.[36] (Doc. 61 at 20, 22.) He also requests attorneys' fees.

---

[36] Although R.S. alludes to a claim for "reimbursement" (Doc. 61 at 15–19), he appears to use that term interchangeably with "compensatory education" (id.). "Reimbursement" under the IDEA is normally understood to refer to payments intended to cover the bill for private school tuition or related services undertaken unilaterally by the parents in the past. Weber, supra, § 22.3(4). "Compensatory education," on the other hand, refers to "educational services ordered by the court to be provided prospectively." Fort Bragg, 343 F.3d at 308. Since there is no record evidence (or claim) that R.S.'s parents enrolled him in a

55

The ALJ's award itself has some equivocal language, as the ALJ first notes that R.S. "has asked for compensatory education services in academic remediation" on a long list of topics, then notes that R.S. "[a]lternatively" asked that the school "fund (not reimburse, but directly fund) not less than three (3) hours per day of private educational instruction and related services, in areas of [R.S.'] academic, physical, social and emotional deficits" every weekday until R.S. achieves a high school diploma. (Doc. 55-1 at 58–59.) Then, rather than explaining which "[a]lternative[]" he is awarding, the ALJ simply states that "[t]he equitable remedy sought by Parents is approved." (Id. at 59.)

To the extent R.S. wishes to "recover[] . . . damages" for IDEA violations (Doc. 61 at 22), that remedy is unavailable under the statute. See Sellers, 141 F.3d at 528. And to the extent his wish for an award "consistent with private school tuition" could be construed as funding a future placement at a private school (Doc. 61 at 22), he has provided no indication of what private school he wishes to attend, why the court should find placement at that school appropriate, or what the cost of attendance might be. This leaves his prayer that "the ALJ's ruling of compensatory education should be reinstated." (Id. at 20.)

---

private school or secured other related services privately after his disenrollment from WCS, the court concludes that reimbursement is an inappropriate remedy in this case. The court will therefore construe R.S.'s arguments for "reimbursement" as arguments for "compensatory education," for which R.S. is eligible.

In the court's view, the ALJ's direct-funding award is both administrable and appropriate in type to make up for WCS's "past deficient program." Fort Bragg, 343 F.3d at 308.  However, the court finds the ALJ's award inappropriate in amount as to its extension of the direct-funding remedy "until [R.S.] graduates from high school." (Doc. 55-1 at 59.)  R.S.'s (brief) argument for such an expansive award period is that WCS's decision to disenroll him "resulted in several years of lost education" — the idea being that R.S. would have remained at WCS until graduating high school had he not been unilaterally disenrolled.[37]  (Doc. 61 at 21.)  The court finds this speculation unsupported by the record in this case.  There is no evidence that R.S. contested the school's disenrollment decision at the time it was made in an attempt to remain at WCS, nor is there evidence that he ever re-applied to WCS in any subsequent year or expressed any interest in attending WCS again.  This is unsurprising, given the parents' mounting frustration with WCS during the 2013–2014 school year.  Moreover, there is no evidence that R.S. was interested in

_____

[37] R.S. notes that the IDEA requires that a child "remain in the then-current educational placement" pending resolution of his or her due process complaint, unless the parents and school agree otherwise.  20 U.S.C. § 1415(j).  Since R.S. was disenrolled from WCS long before he initiated his due process complaint, this provision is inapplicable to his case.  To the extent R.S. means to argue that he would have initiated his due process complaint earlier in order to take advantage of § 1415(j) to stay at WCS had he received prior written notice, the court is unconvinced — for the reasons discussed below — that R.S. or his parents had any interest in him remaining at WCS in subsequent school years.

attending any other traditional school after the 2013-2014 school year, his mother's testimony being that she decided to homeschool him beginning in the 2014-2015 school year. (Tr. Vol. 11 at 2451.) Absent evidence to the contrary, the court presumes that R.S. could have attended a local public school in the 2014-2015 school year (and thereafter) had he wanted to do so, and that school would have been required under the IDEA to provide him with a FAPE.

As a result, the court finds that the appropriate term for the direct-funding remedy described by the ALJ is a term tailored to match the portions of the 2013-2014 school year in which R.S. was denied rights under the IDEA. As to the period between August 20, 2013, and November 17, 2013, R.S. is owed direct funding for private educational instruction and/or related services equal to the number of hours he should have been receiving services comparable to the APE called for in the PMSD IEP. As to the period beginning on November 17, 2013, and running through the balance of the 2013-2014 school year, when WCS should have been implementing a North Carolina IEP, R.S. is owed the full amount of direct funding specified by the ALJ: not less than three hours of private educational instruction and/or related services per school day. While the parents are free to actually schedule the instruction and/or services three hours each day, five days each week, as the ALJ laid out, the court (like the SRO) sees no reason to bind them to such a usage. Instead, the parents are free to schedule the

58

instruction and services at their convenience up to the total hourly amount, provided that the instruction and services be completed by the end of the 2019-2020 school year. In accordance with the ALJ's directions, the parents may choose the providers of the instruction and services, so long as the providers are properly credentialed or licensed and their rates do not exceed the prevailing market rate for such instruction or services in the community where the instruction or services are provided. Finally, the parents are to be reimbursed for any travel costs reasonably necessary to secure appropriate instruction and/or services.

As to attorneys' fees, the IDEA authorizes "reasonable" fee awards "to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(i)(3)(B). R.S. may pursue his claim for attorneys' fees through a separate motion that complies with Local Rule 54.2.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that R.S.'s motion for summary judgment is GRANTED and WCS's motion for summary judgment is DENIED. WCS shall fund private educational instruction and/or related services not less than the number of hours R.S. should have received services comparable to APE between August 20, 2013, and November 17, 2013, plus the number of hours equal to three hours per school day between November 17, 2013, and the end of the

2013-2014 school year.  The instruction and services shall be completed by the end of the 2019-2020 school year.  The parents may choose the providers of the instruction and services, so long as the providers are properly credentialed or licensed and their rates do not exceed the prevailing market rate for such instruction or services in the community where the instruction or services are provided.  Finally, the parents are to be reimbursed for any travel costs reasonably necessary to secure appropriate instruction and/or services.

/s/   Thomas D. Schroeder
United States District Judge

March 4, 2019