IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

R.S., by and through his        )
father, RONALD E. SOLTES,        )
                                 )
            Plaintiff,           )
                                 )
        v.                       )        1:16-cv-119
                                 )
BOARD OF DIRECTORS OF WOODS      )
CHARTER SCHOOL COMPANY, WOODS    )
CHARTER SCHOOL, and DOES 1 TO    )
10, inclusive,                   )
                                 )
            Defendants.          )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, Chief District Judge.

This is an action brought under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. Before the court are two motions for attorneys' fees filed by Plaintiff R.S., by and through his father Ronald Soltes (Doc. 98), and by movants J. Denton Adams and Steven Wyner (Doc. 101), as a result of this court's previous grant of R.S.'s motion for summary judgment against Defendants Board of Directors of Woods Charter School Company and the Woods Charter School (collectively "WCS").[1] For the reasons set forth below, the motions will be granted in

---

[1] R.S. initially named as defendants "DOES 1 to 10." The complaint states that R.S. is "ignorant of the names and capacities of the Defendants sued herein as DOES 1 to 10" and that he "will seek leave of Court to amend this Complaint to allege the true names and capacities of said defendants when they have been ascertained." (Doc. 32 at 4.) R.S. did not allege the true names and capacities of these defendants in his first amended complaint, and his motion for leave to file a second amended complaint was denied. (Doc. 36.)

part.

## I. BACKGROUND

The history of this litigation is set out in the court's prior opinion granting R.S.'s motion for summary judgment and will be recounted here only as relevant to the present motions. See R.S. v. Bd. of Directors of Woods Charter Sch. Co., No. 1:16-CV-119, 2019 WL 1025930 (M.D.N.C. Mar. 4, 2019), aff'd sub nom. R.S. By & through Soltes v. Bd. of Directors of Woods Charter Sch. Co., 806 F. App'x 229 (4th Cir. 2020).

R.S. was born in 2000 and diagnosed with Non-Verbal Learning Disability. For the 2012-2013 school year, R.S. attended school in the Pocono Mountain School District ("PMSD") in Pennsylvania, which developed an individualized education program ("IEP") for him. That IEP called for 21 accommodations, including speech and language services, occupational therapy, adapted physical education, and assistive technology. On August 20, 2013, R.S. enrolled as an eighth grader at WCS. He started receiving speech and language services and occupational therapy from WCS in early September.

On September 13, WCS's Special Education Director Lawrence Smiley met with R.S.'s teachers to discuss the accommodations set out in R.S.'s PMSD IEP. On September 19, Smiley and WCS's principal, Cotton Bryan, held an informal meeting with R.S.'s parents to discuss the parents' concerns and the status of efforts

to develop a new IEP for R.S.  By October 5, R.S.'s parents had begun expressing concerns about R.S.'s academic progress and questioning WCS's provision of accommodations, and communication between the school and parents had become "strained."

Although WCS had proposed earlier IEP meetings, WCS did not hold its first formal IEP meeting for R.S. until October 28.  A second IEP meeting -- this time via telephone -- was scheduled for November 1 with WCS staff; R.S.'s father, Ronald Soltes; and a facilitator from the North Carolina Department of Public Instruction ("DPI").  R.S.'s father did not answer the phone at the appointed time, and the IEP team held the November 1 meeting without him.  During this meeting, WCS finalized a draft IEP, which Smiley sent to R.S.'s parents.

Smiley scheduled a third IEP meeting for November 12 and invited R.S.'s parents.  By this time R.S.'s parents had retained legal counsel.  R.S.'s parents never confirmed their attendance at the November 12 IEP meeting, and the meeting was never held.

On December 2, R.S. had a panic attack at home and fell down a set of stairs, injuring himself.  His parents did not send him back to WCS following his fall, and December 2 proved to be his last day of attendance.  The parents received letters from the principal, Bryan, in December 2013 and January 2014 regarding R.S.'s accumulation of unexcused absences.  Through the end of February 2014, WCS's special education teacher Katy Hankins

emailed R.S.'s homework and assignments to his parents; Smiley directed her to cease this practice on February 28. On March 6, 2014 Bryan sent R.S.'s parents a letter informing them that WCS was withdrawing R.S. from enrollment.

Under the IDEA, "all states receiving federal funds for education [are required] to provide disabled schoolchildren with a 'free appropriate public education' ('FAPE')." Cnty. Sch. Bd. of Henrico Cty. v. Z.P. ex rel. R.P., 399 F.3d 298, 300 (4th Cir. 2005) (quoting 20 U.S.C. § 1412(a)(1)(A)). If a child's parents have grievances with respect to a local education agency's provision of a FAPE, they are entitled to file a complaint and receive "an impartial due process hearing" conducted by a state officer "as determined by State law or by the State educational agency." 20 U.S.C. § 1415(f). North Carolina has a two-tiered structure for due process hearings. The initial due process proceedings are held by an administrative law judge ("ALJ") appointed by the North Carolina Office of Administrative Hearings ("OAH"). E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ., 773 F.3d 509, 513 (4th Cir. 2014) (citing N.C. Gen. Stat. § 115C-109.6). The parties can then appeal the ALJ's findings of fact and conclusions of law to a state review officer ("SRO") appointed by the North Carolina State Board of Education ("BOE"), who makes an independent decision on the written record. Id. (citing N.C. Gen. Stat. § 115C-109.9). Once this administrative

review process has been exhausted, dissatisfied parties may bring a civil action in federal district court within 90 days of the final state administrative decision.  20 U.S.C. § 1415(i)(2).

On October 31, 2014, R.S., by and through his parents, initiated a due process proceeding against WCS, BOE, and DPI, contending that WCS had denied him a FAPE during the 2013-2014 school year.  OAH appointed the Honorable Sidney S. Eagles, Jr. as the ALJ for the matter.  On May 28, 2015, the ALJ dismissed BOE and DPI as respondents.  In June and July -- after multiple continuations -- the ALJ held a 14-day hearing in which a total of 19 witnesses were called and 153 exhibits were presented.  (See Doc. 55-1.)  On October 22, the ALJ issued a 61-page final decision finding that WCS denied R.S. a FAPE on numerous grounds and granting him extensive compensatory education.  WCS timely appealed, and the BOE appointed the Honorable Joe D. Walters as SRO for the appeal.  The SRO received written arguments from the parties on December 30, 2015, and issued a 34-page decision on January 14, 2016, rejecting the ALJ's findings of fact, reversing most (but not all) of the ALJ's conclusions of law, and granting R.S. reduced compensatory education on the basis of a single denial of FAPE in that WCS failed to timely develop a North Carolina IEP for R.S.

On February 16, 2016, R.S. filed his complaint in this court. (Doc. 1.)  WCS filed an answer and counterclaim. (Doc. 8.)  On

January 24, 2017, the Magistrate Judge denied R.S.'s request for additional discovery. (Doc. 19.) On March 24, R.S. moved to file an amended complaint. (Doc. 23.) During this time the parties also attempted mediation, but R.S.'s counsel failed to be present for the mediation within the time allowed. (Doc. 26.) R.S.'s attorneys subsequently moved to withdraw from their representation of R.S. (Docs. 27; 28), and the Magistrate Judge granted the requests on June 2, 2017. R.S. filed an amended complaint (Doc. 32) through new counsel on August 31, 2017, while simultaneously moving for leave to file a second amended complaint (Doc. 31). On January 9, 2018, the court -- after noting that "[t]his case has been unnecessarily plagued by delay" -- denied R.S.'s motion to file a second amended complaint. (Doc. 36 at 1.) The parties filed cross-motions for summary judgment on April 23, 2018. (Docs. 50; 52.)

In March 2019, this court granted R.S.'s motion for summary judgment and denied WCS's motion for summary judgment. Woods Charter Sch., 2019 WL 1025930, at *1. In April 2019, R.S., proceeding *pro se*, appealed to the Fourth Circuit. (Doc. 68.) WCS moved to stay all proceedings regarding attorneys' fees pending the resolution of the appeal (Doc. 74), which motion this court granted (Doc. 79). On May 27, 2020 the Fourth Circuit affirmed this court. R.S. By & through Soltes, 806 F. App'x at 230. The mandate issued on July 1, 2020, after the Fourth Circuit denied

6

R.S.'s *pro se* petition for rehearing and rehearing *en banc*.  (Doc. 84.)

Both sets of R.S.'s attorneys have now moved for attorneys' fees and costs.  The first motion is filed by Plaintiff, by and through his attorneys, Kelli Espaillat and Keith Howard.  (Doc. 98.)  Plaintiff requests reimbursement from July 27, 2017, until August 28, 2020 -- a total of $59,575 in attorneys' fees for Espaillat and $66,835 in attorneys' fees for Howard -- plus $89,899.20 in expenses and costs.[2]  (Doc. 99.)  In support, they attach affidavits from both Espaillat and Howard (Doc. 99-1; declarations from Stacey Gahagan and Ann Paradis, attorneys licensed to practice in North Carolina and who focus on education matters (Doc. 99-2); and time and expense records (Docs. 99-3, 99-4).

The second motion is filed by J. Denton Adams and Steven Wyner, Plaintiff's initial attorneys for this matter.  (Doc. 101.) Adams and Wyner request reimbursement from October 28, 2013,[3] until

---

[2] The amount requested by Howard does not align with his stated billable hours and rates.  Howard says he billed 268.7 hours at $250 per hour and an associate attorney billed 1.9 hours at $150 per hour.  (Doc. 99 ¶¶ 45, 47.)  This equates to total billings of $67,460, not the $66,825 he requests.  Counsel say they "reduced their respective fee request by eliminating from their request hours that are not properly the subject of a fee award," but it is not clear which hours were reduced.  (Id. ¶ 55.)

[3] Adams and Wyner have broken out their billing records into phases, of which the first phase ostensibly started on October 22, 2014.  However, Adams includes in his billing records hours worked dating back to October

7

August 29, 2020 -- a total of $226,518 in attorneys' fees for Adams and $581,403 in attorneys' fees for Wyner -- plus $19,602.64 in expenses and costs.[4]  In support, they attach affidavits from themselves, which include time and expense records (Docs. 102; 103); a declaration from Irving Joyner, an attorney licensed to practice in North Carolina (Doc. 104); an affidavit from Peter Wright, an attorney licensed to practice in Virginia (Doc. 105); and multiple cases.

The motions are fully briefed and ready for decision.

## II. ANALYSIS

### A.   Standing

The court starts by addressing a threshold issue: standing. As this court previously noted, a motion for attorneys' fees under the IDEA is not unusual.  What is atypical in this case is that there are two such motions -- one filed by Plaintiff, by and through his current counsel, Espaillat and Howard, and a second filed by Plaintiff's former counsel, Adams and Wyner.

The IDEA limits the award of attorneys' fees "to a prevailing

---

28, 2013, when he was first retained by Plaintiff.  No explanation is given for the discrepancy.

[4] These figures are based on the following: 1,132.59 hours billed by Adams at a rate of $200 per hour; 1,117.9 hours billed by Wyner at $475 per hour; and 336 hours billed by two associate attorneys working for Wyner at $150 per hour.  As discussed infra, Wyner initially sought higher rates but reduced them in his reply brief.  The expenses are $15,117.05 for Wyner and $4,485.59 for Adams.  (Docs. 102 ¶ 18; 103 ¶¶ 56-57.)

party who is the parent of a child with a disability." 20 U.S.C
§ 1415(i)(3)(B)(i) (emphasis added). Courts have generally
interpreted this provision to mean that only the parent -- and not
an attorney seeking to vindicate his own interest -- has standing
to seek attorneys' fees under the IDEA. See, e.g., Davidson v.
D.C., 736 F. Supp. 2d 115, 127-28 (D.D.C. 2010); Adams v. Compton
Unified Sch. Dist., No. CV1404753BROPJWX, 2015 WL 12748005, at *3
(C.D. Cal. July 16, 2015). This accords with cases interpreting
42 U.S.C. § 1988, which vests the right to seek attorneys' fees in
federal civil rights actions in the prevailing party, not his
attorney. See Evans v. Jeff D., 475 U.S. 717, 730-32 & n.19
(1986).

Here, while Plaintiff clearly has standing as the prevailing
party to pursue his motion for reimbursement of attorneys' fees
and costs owed to his present counsel, Espaillat and Howard, Adams
and Wyner are not the "prevailing party," and they brought their
motion for attorneys' fees on their own behalf. Adams and Wyner
did not address whether they had standing to do so. The court
therefore directed them to address this issue. (Doc. 117.) Adams
and Wyner have now filed their response with supporting documents
(Doc. 127), and WCS has filed a reply (Doc. 130).

Based on the additional materials filed, the court finds that
Adams and Wyner have standing to file their motion.

The text of the IDEA is clear: attorneys' fees are awarded to

"to a prevailing party who is the parent of a child with a disability," not to the party's attorney, whether current or former.  20 U.S.C § 1415(i)(3)(B)(i).  As courts have noted in the analogous § 1988 context, an attorney's entitlement to fees depends on the contract between the attorney and client.  When there is a fee-shifting provision, "a claim for such an award must itself be made by the party rather than the attorney."  Brown v. Gen. Motors Corp., Chevrolet Div., 722 F.2d 1009, 1011 (2d Cir. 1983) (emphasis added).  This ensures that the plaintiff retains control over the litigation and avoids any conflicts of interest between the attorney and client.  In other words, this court must ensure that R.S.'s father, Ronald Soltes, consents to Adams and Wyner's motion.

    WCS argues that Adams and Wyner have failed to make this showing because they did not provide a declaration from the Solteses indicating they consented to the fees request.  (Doc. 130 at 7-9); see, e.g., Adams, 2015 WL 12748005, at *3 (standing to seek fees in an IDEA case exists when plaintiff submitted a declaration stating she "whole-heartedly agrees to join in as a named plaintiff in the case") (alterations omitted).  While a declaration from the Solteses would certainly have been more straightforward than what this court received -- a 17-page brief, 65-pages of exhibits, and four affidavits -- it is not a requirement.  The Solteses' current attorneys, Espaillat and Howard, as Plaintiffs' agents, can represent Plaintiffs' position

before this court. Espaillat and Howard have indicated in their affidavits to this court that the Solteses have directed them to work with Adams and Wyner to seek recovery of their attorneys' fees and costs. Particularly relevant is that, after this court granted summary judgment to R.S. in March 2019, the Solteses instructed Espaillat and Howard to communicate directly with Adams and Wyner about the recovery of attorney's fees. (Docs. 124 ¶ 4; 125 ¶ 3; see also Doc. 126 at 43.) The lawyers have done so. Further, Ronald Soltes emailed all counsel, including Adams and Wyner, requesting they keep him updated on the effort to collect fees and costs. Specifically, he stated, "I have costs which I expect will be addressed appropriately and resolved" and requests that each attorney "keep me informed and . . . provide clear instruction which will preserve my ability to recoup my costs including fees already paid." (Doc. 126 at 51.) Moreover, in compliance with Soltes's request, Adams's law firm also emailed the Solteses in May 2019 stating its intent "to file a motion to recover our attorneys' fees as well as costs we incurred and paid during the course of our representation of your child," with no apparent objection from the Solteses. (Id. at 55.)

In sum, the court finds that Ronald Soltes, as a prevailing party who is a parent of R.S., is entitled to reasonable attorneys' fees. His agreement with Adams and Wyner requires him to pay each lawyer's fees and notes that Wyner and Adams would move for

statutory fees, if any.  (E.g., Doc. 126 at 12-16.)  Ronald Soltes

and his wife were actively involved in this matter, including

during the seeking of fees, and they directed their current counsel

to work with Adams and Wyner to file for fees.  In other words, it

is clear that Adams and Wyner's fees action was "commenced with

the knowledge and consent of the plaintiffs."  See Davidson, 736

F. Supp. 2d at 128.  This distinguishes it from other cases.  See

Davidson v. D.C., No. CIV.A. 09-1283 RMU, 2010 WL 4259600, at *1

(D.D.C. Oct. 22, 2010) (dismissing claim for attorneys' fees with

prejudice when counsel fails to file declaration from the plaintiff

indicating the fees action was commenced with plaintiff's

knowledge and consent and plaintiff herself requested the claim be

dismissed).

Accordingly, the court finds that Adams and Wyner have

standing to bring their motion seeking fees for Ronald Soltes.

### B.  Attorneys' Fees Under the IDEA

The IDEA permits reasonable attorneys' fees to a prevailing

party.  20 U.S.C. § 1415(i)(3)(B)(i).  This includes fees related

to a prior administrative proceeding.  See id. (referencing fees

in "any action or proceeding"); Combs v. Sch. Bd. of Rockingham

Cnty., 15 F.3d 357, 359 n.10 (4th Cir. 1994) ("The IDEA allows

parties to bring an independent action in federal court solely to

recover fees incurred in an administrative proceeding.").  The

party seeking attorneys' fees bears the burden of establishing

entitlement to an award and documenting the hours appropriately expended and hourly rates.  See Hensley v. Eckerhart, 461 U.S. 424, 437.

Under the IDEA, the court has discretion to determine the amount of an attorneys' fee award.  20 U.S.C. § 1415(i)(3)(B)(i); J.D. ex rel. Davis v. Kanawha Cnty. Bd. of Educ., 571 F.3d 381, 387 (4th Cir. 2009).  The Supreme Court has reminded that "'there is no precise rule or formula' for determining the amount of attorneys' fees, and that district courts 'necessarily have discretion' in such matters."  Id. (quoting Hensley, 461 U.S. at 436-37 (alterations omitted)).

In determining a reasonable fee, the court considers the twelve factors set out in Hensley:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

Hensley, 461 U.S. at 430 n.3.[5]

---

[5] These factors are sometimes called the "Johnson factors," the Supreme Court in Hensley having adopted the same from Johnson v. Georgia Highway Exp., Inc., 488 F.2d 714 (5th Cir. 1974); see Daly v. Hill, 790 F.2d 1071, 1075 n.2 & 1077 (4th Cir. 1986) (noting in civil rights actions that the Fourth Circuit "has long considered the *Johnson* factors to be

"The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."  Id. at 433. This is the lodestar approach, which is employed generally in civil rights cases, including IDEA cases subject to specific limitations in that statute.  See Kanawha Cnty. Bd., 571 F.3d at 387; AD ex rel. SD v. Bd. of Pub. Educ. of City of Asheville, 99 F. Supp. 2d 683, 687 (W.D.N.C. 1999) (applying Hensley in the IDEA context). The lodestar provides "an objective basis on which to make an initial estimate of the value of a lawyer's services."  Hensley, 461 U.S. at 433.

Thus, the court must first calculate reasonable hours and a reasonable hourly rate.  The court must also inquire into whether the plaintiff achieved a level of success that makes the hours expended a satisfactory basis upon which to make a fee award.  Cone v. Randolph Cnty. Sch. Bd. of Educ., No. 1:06CV00579, 2010 WL 1610445, at *4 (M.D.N.C. Apr. 19, 2010).  If a lawsuit consists of related claims, a plaintiff winning substantial relief should not have his attorneys' fees reduced simply because the district court did not adopt each contention raised.  Id.  However, if a plaintiff attains only partial or limited success, the lodestar may be excessive even where the plaintiff's claims were interrelated,

the appropriate standards to guide a district court's discretion in awarding attorney's fees").

non-frivolous, and raised in good faith. Id. In exercising its discretion with respect to partial success, the court "may attempt to identify specific hours that should be eliminated, or it may simply reduce the award to account for the limited success." Hensley, 461 U.S. at 434-37 & 440.

In the end, the most critical factor in determining a fee award is the "degree of success obtained." Id. at 436. In evaluating the degree of success, the court does not simply take "a mathematical approach comparing the total number of issues in the case with those actually prevailed upon." Id. at 435 n. 11.

### C.    Prevailing Party

In its prior summary judgment opinion this court did not make an express determination as to whether R.S. was a "prevailing party" under the IDEA, although the court did note that R.S. could pursue his claim for attorneys' fees through a separate motion. Woods Charter Sch., 2019 WL 1025930, at *22.

"[A] party need not prevail on every issue or even the most 'central' issue in a proceeding to be considered a 'prevailing party.'" Kanawha Cnty. Bd., 571 F.3d at 387. Rather, litigants are "a prevailing party for purposes of an attorneys' fees award if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." Cone v. Randolph Cnty. Sch. Bd. of Educ., 657 F. Supp. 2d 667, 682 (M.D.N.C. 2009) (citation and quotations omitted).

Movants Adams and Wyner are the only party to address the merits of this issue, arguing that R.S. is a prevailing party. (Doc. 106 at 15.)  The court agrees.  This court's award of compensatory education means R.S. "achieve[d] some of the benefit . . . sought in bringing suit," making him a prevailing party under the IDEA.  Cone, 657 F. Supp. 2d at 682.

As will be seen, however, the emphasis is on "some" -- R.S. achieved "some of the benefit" sought in this suit.  See id. (emphasis added).  Indeed, and as discussed in more detail below, this case has been a protracted affair and bears hallmarks of having been significantly over-litigated.  No doubt, IDEA cases have the potential for such results, as one can hardly fault parents for seeking what they regard to be in the best interests of their child.  And sometimes schools may not fully appreciate, or perhaps worse – ignore, their obligations under the law.  This case is animated by aspects of both factors.  For example, this was the first experience WCS, a charter school, had with implementing an IEP, and there are indications the school may not have fully appreciated the challenge it faced.  On the other side of the ledger, R.S.'s parents obtained counsel even before WCS's 90-day window to complete R.S.'s IEP expired.  The parents also had disagreements with their own counsel of such magnitude that Adams and Wyner felt compelled to withdraw.  And the parents ultimately proceeded pro se through a futile appeal to the Fourth

Circuit.  While R.S. was awarded significant relief by the ALJ --
after a protracted 14-day hearing over the provision of educational
services for a single student for a single school year -- that
relief was dramatically reduced, first by the SRO and then by this
court.

So while the court acknowledges that R.S. was a "prevailing
party" and is entitled to attorneys' fees, any award must be
situated in the overall context of this litigation, which is
pushing eight years and counting.

### D.    Determination of Reasonable Attorneys' Fees

In determining a reasonable attorneys' fee, the court will
first ascertain the number of hours reasonably expended and the
reasonable hourly rates.  Any adjustment to the initial lodestar
calculation will then be considered.

### 1.    Reasonable Number of Hours

In seeking a fee award, a plaintiff should "submit evidence
supporting the hours worked."  Hensley, 461 U.S. at 433.  Time
that is "excessive, redundant, or otherwise unnecessary" will be
reduced or excluded to reflect the number of hours which would be
properly billed to a client.  See id. at 434; Daly, 790 F.2d at
1079.  The Johnson factors most relevant to determining the
reasonable number of hours are (1) the time and labor required and
(2) the novelty and difficulty of the questions.  Bd. of Pub. Educ.

of City of Asheville, 99 F. Supp. 2d at 690; Cone, 2010 WL 1610445, at *4.

### a. Espaillat and Howard

Espaillat and Howard argue that 238.2 hours is reasonable for the work of Espaillat and 270.6 hours, which includes 1.9 hours for an associate attorney, is reasonable for the work of Howard. (Doc. 99 ¶¶ 45-46.) They state that they have eliminated from their request any hours that are not properly the subject of a fee award. (Id. ¶ 55.) The only evidence they provide in terms of the reasonableness of the number of hours worked are their own affidavits, in which each testify that, based on their experience in the field, the hours spent on this matter are reasonable. (Doc. 99-1 at 5, 10.) WCS argues that the hours are excessive and duplicative due to the change in counsel and time spent on several unsuccessful motions, including the motion to file a second amended complaint. (Doc. 111 at 11-13.) WCS has otherwise presented no extrinsic evidence as to the reasonableness of the time incurred.

One of the chief difficulties in this case stems from the change in counsel late in the litigation, specifically after the entirety of the state administrative hearings and after the case had been pending in this court for almost a year and a half. The switch grew out of Plaintiff's disagreement with prior counsel over litigation strategy (Docs. 27; 28), which led this court to comment that "it was Plaintiff who wished to dismiss his former

18

counsel well into the action" (Doc. 36 at 6). Espaillat and Howard deserve some time to become familiar with a lengthy record upon their retention, but WCS should not have to pay for Plaintiff's litigation choices. Espaillat and Howard, as experienced education law attorneys, surely knew the risks they took in hopping in at the 11th hour.

Espaillat and Howard did not succeed on their motion for leave to file a second amended complaint. As this court noted, their "proposed pleading [was] fraught with problems" and sought to "transform this action from an appeal of the State Review Officer's decision into a new lawsuit against new Defendants based on newly-asserted substantive claims." (Doc. 36 at 5-6.) The court has reviewed counsels' billing records to identify time spent on the second amended complaint, including both filing the initial motion and responding to WCS' objections. While some entries are vague (e.g., "Phone call with co-counsel on strategy"), the court limits its review to entries that are focused solely on the second amended complaint. The court will therefore deduct 45.2 hours for Espaillat and 41.4 hours for Howard, including 1.9 hours for an associate attorney related to this aspect of the case. Contrary to WCS's contention, time spent otherwise reviewing the record appears to be minimal and not unnecessarily duplicative.

In addition, Espaillat and Howard first moved for attorneys' fees on March 18, 2019. (Doc. 65.) They moved again with the

present motion, filed August 30, 2020. Given that the present motion is more thorough than the initial motion (which was devoid of legal analysis) and was filed in conjunction with the same motion from Plaintiff's prior counsel and after court-ordered attempted settlement discussions with WCS, the court finds that time spent on the present motion is reasonable and time spent on the first motion is partly duplicative. The court will therefore deduct 4.1 hours for Espaillat and 12.7 hours for Howard. The court has reviewed the remainder of the billing records, which are primarily devoted to attempted mediation and the summary judgment motion, and finds the time spent is reasonable.

Having deducted these hours, the court determines that the reasonable hours component is 188.9 hours for Espaillat and 216.5 hours for Howard.

### b.  Adams and Wyner

Adams and Wyner argue that 1,132.59 hours is reasonable for the work of Adams (970.35 hours for the administrative hearing and 162.24 hours for the lawsuit) and 1,453.9 hours is reasonable for the work of Wyner (1,130.9 hours for the administrative hearing and 323 hours for the lawsuit). (Doc. 106 at 16-17.) The total hours for Wyner is divided into 1,117.9 hours for Wyner and 336 hours for two associate attorneys. While they attach affidavits, including their own, that support their hourly rates, qualifications, and the results obtained in this action, nothing

speaks directly in support of the reasonableness of their hours. WCS takes issue with what it characterizes as "vague" time entries. (Doc. 112 at 4.)  It also argues that the hours are excessive especially in light of the results achieved, pointing specifically to time Adams spent drafting the OAH petition, time Adams and Wyner spent drafting the complaint and first amended complaint, and time Wyner spent after withdrawing as counsel for Plaintiff.  (Id. at 5-6.)  WCS has otherwise presented no extrinsic evidence as to the reasonableness of the time incurred.

Adams states that his billing records "do not include any work prior to the drafting of a petition" for an OAH hearing. (Doc. 102 ¶ 12.)  Elsewhere he goes further, saying his "billing records do not reflect the time he spent preparing the Petition." (Doc. 116 at 5 n.4.)  However, Adams also says he "filed the Petition on October 31, 2013" (id.) which is incorrect; the petition was filed October 31, 2014 (see Doc. 106 at 1).  Adams and Wyner further divide their billing records into "phases," the first of which starts October 22, 2014.  Despite this, Adams's billing records include several pages of entries dating back to October 28, 2013.  (Doc. 102-2 at 2-5.)  This includes time in which R.S. was still enrolled at WCS and during which, ostensibly, the school and R.S.'s parents were attempting to develop an IEP for R.S.  Accordingly, the court will deduct hours billed prior to March 6, 2014, when WCS formally withdrew R.S. from the school.

Time billed before this point cannot fairly be said to have been spent on an "action or proceeding" as required by the IDEA for the simple reason that there was no action or proceeding at that point. See 20 U.S.C. § 1415(i)(3)(B).  This is also in line with Adams's stated practice from his affidavit.  This equates to a reduction of 38.66 hours.

WCS objects to time Adams and Wyner spent preparing the complaint and first amended complaint, which WCS has identified as 59.39 hours for Adams and 139 hours for Wyner (including 103.6 hours for an associate attorney).  (Doc. 112 at 5.)  The court has independently reviewed the time billings and finds that Adams spent 39.56 hours on the complaint while Wyner spent 106.7 hours on the complaint and first amended complaint (46.5 hours for Wyner and 60.2 hours for an associate attorney).  While the hours are perhaps somewhat high considering the time already spent on the administrative proceedings beforehand, the court cannot say this time is unjustified.  Therefore, the court will not reduce any time in preparing the complaint and first amended complaint for purposes of calculating the lodestar.

The last item WCS specifically objects to is time Wyner spent after withdrawing from the case, i.e., after the court granted his motion to withdraw on June 2, 2017.  Almost the entirety of this time was spent preparing the present motion for attorneys' fees and costs.  A prevailing party is permitted to collect fees for

time spent preparing such a motion. See Bd. of Pub. Educ. of City of Asheville, 99 F. Supp. 2d at 691. However, a "request for attorney's fees should not result in a second major litigation." Hensley, 461 U.S. at 437. And, as always, such fees must be "reasonable." 20 U.S.C. § 1415(i)(3)(B)(i). Here, Wyner's billing records indicate that he personally spent a total of 111 hours preparing his motion for attorneys' fees. This is an extraordinary amount of time, equating to almost three weeks of full-time, billable work. Put another way, Wyner spent approximately 10 percent of his total time on the present motion. This is clearly excessive, especially given the final output. The brief in support of his fees motion contains a lengthy recitation of the facts (14 out of 21 substantive pages) despite the fact that this court was already intimately familiar with the facts of this case, having engaged with it for over four years. Several pages of that background section are pulled verbatim from the ALJ's decision, the brief is light on legal analysis, and it appears Wyner was able to leverage a declaration from a prior case in support of this motion. (Doc. 103-10 at 24.) Most of the records of costs and expenses were submitted by Plaintiff's current counsel, not Wyner. Mitigating this is the fact that Adams does not appear to be seeking fees for any time he spent on the present motion. In light of all this, the court finds the 111 hours to be excessive

and will reduce by 50 percent, resulting in 55.5 hours for the lodestar calculation.

While these are the issues WCS raises with specificity with the court,[6] the court, upon its careful review of the time billings, has identified several other areas that are overstated.

First are excessive hours spent preparing for the OAH hearings that were rescheduled. The OAH hearing was initially scheduled for February 24, 2015 but was cancelled due to weather and then continued to March 25. It was subsequently continued a second time before ultimately commencing June 22. (Doc. 106 at 2-3.) Despite the hearing being continued on February 25, Wyner's records indicate he remained in North Carolina (having traveled from California to attend the hearing) until March 1 and continued to prepare for a hearing that had been rescheduled for a month later. (Doc. 103-9 at 7-10.) The court will therefore deduct 10.6 hours from Wyner's total hours for purposes of the lodestar. Relatedly, Wyner's billing records reflect he billed twice for his travel home to California. (Id. at 6, 10.) The court will therefore deduct an additional 9.5 hours.

---

[6] WCS does object to what it labels as "vague" descriptions of time entries. (Doc. 112 at 4.) The court disagrees. While Adams engaged in some "block billing" -- listing entire days of work in a single time entry, making it difficult for the court to separate reasonable from unreasonable time -- the entries generally allow the court to ascertain how the time was spent with reasonable specificity. And Wyner's records are especially thorough. In both cases, any problems do not limit the court's ability to determine a reasonable number of hours worked.

Second is time spent reinstating the North Carolina Department of Public Instruction and North Carolina State Board of Education as defendants. Both DPI and BOE were named as defendants in the initial October 31, 2014 OAH petition. Both moved to dismiss, Plaintiff filed a notice of voluntary dismissal without prejudice, and both were dismissed. (Doc. 55-1 at 7.) On March 20, 2015 Plaintiff filed a motion for leave to file an amended petition reinstating DPI and BOE, which was granted on April 7. (Id.) On April 23, both DPI and BOE again moved to dismiss and, after a hearing, were dismissed with prejudice by the ALJ. (Id. at 8.) The record is not fully clear on why Plaintiff opted to amend his OAH petition to reinstate DPI and BOE as defendants. The court notes that Plaintiff did not appear to have considered doing so until March 2015 -- i.e., after the OAH hearing was originally supposed to take place in February -- and that the grounds for dismissal were the same in both instances. The court finds that requiring these defendants to defend, successfully and on the same grounds, a second time, especially well into the adjudication process, is unnecessarily duplicative. The court will therefore deduct time spent on the amended OAH petition. This equates to 30.4 hours of Wyner's time.

Finally, Adams and Wyner spent significant time researching a possible challenge to North Carolina's "two-tier" system of

review for IDEA claims.[7] However, North Carolina's system had been expressly upheld -- by this court, and then on appeal by the Fourth Circuit -- prior to R.S.'s initial OAH petition on October 31, 2014. E.L. ex rel. G.L. v. Chapel Hill-Carrboro Bd. of Educ., 975 F. Supp. 2d 528, 531-33 (M.D.N.C. 2013), aff'd sub nom. E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ., 773 F.3d 509 (4th Cir. 2014). The possible challenge was seemingly never pursued, at the very least, it was not listed as an issue for the ALJ, SRO, or in the complaint to this court. (Docs. 1; 55-1 at 3-6; 55-2 at 4.) While not every unsuccessful litigation strategy, including one that seeks to overturn precedent, is unreasonable, the court finds that the sheer volume of time spent on this approach, in light of binding precedent issued the same year as R.S.'s initial OAH petition, is unreasonable. This is especially so given that the ambition was seemingly to enlarge this matter from an appeal of the SRO's decision involving the provision of services to a single student, R.S., into a larger challenge to

---

[7] This court explained the distinction: "The IDEA provides for a system of administrative review before any claims arising under it may be pursued in state or federal court. Under the IDEA, states choose between a one-tiered system, in which a 'state educational agency' decides the case, and a two-tiered system, in which a 'local educational agency' initially decides the case and any appeal must be taken to a state educational agency review officer. Any aggrieved party may file an original civil action in the courts only after a decision on the merits by a state educational agency." Chapel Hill-Carrboro Bd. of Educ., 975 F. Supp. 2d at 531-32 (citing 20 U.S.C. § 1415(f), (g), and (i)).

North Carolina's entire system. (See, e.g., Doc. 103-10 at 2 (considering an email from other parents seeking to challenge North Carolina's two-tier system).) The court will therefore deduct 2.33 hours from Adams's time and 60.7 hours from Wyner's time (23 hours for Wyner and 37.7 for an associate attorney).

Having deducted these hours, the court determines that the reasonable hours component is 1,091.6 hours for Adams and 1,287.2 hours for Wyner (988.9 hours for Wyner and 298.3 hours for two associate attorneys).

### 2. Reasonable Hourly Rate

The IDEA expressly requires that any fees awarded "shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished." 20 U.S.C. § 1415(i)(3)(C); see Craig v. Sec'y, Dep't of Health & Human Servs., 864 F.2d 324, 328 (4th Cir. 1989) ("A reasonable rate of compensation is the prevailing market rate in the relevant community for similar services."), abrogated on other grounds Gisbrecht v. Barnhart, 535 U.S. 789 (2002).

Espaillat and Howard assert that $250 per hour is a reasonable rate for an experienced attorney and $150 per hour is a reasonable rate for an associate attorney. (Doc. 99 ¶ 47.) Both attorneys state they have voluntarily reduced their original rates for this case, from an original $300 per hour for Espaillat and $350 per hour for Howard. (Id. ¶¶ 52-53.) In support of their request,

they attach declarations from Stacey Gahagan and Ann Paradis, both of whom are licensed to practice law in North Carolina and both of whom specialize in education law. Both Gahagan and Paradis state that an hourly rate of $250 is reasonable for Espaillat and Howard. (See Doc. 99-2.) WCS does not oppose these rates. (Doc. 111 at 13.) The court agrees and finds that these rates are reasonable for both attorneys, who have significant special education law experience in this state, and are in line with rates approved in other IDEA cases in this circuit including by this court. See, e.g., Kanawha Cnty. Bd., 571 F.3d at 387 (affirming district court's award of $250 per hour); Cone, 2010 WL 1610445, at *6 ($250 and $225 per hour based on attorney's experience); B.P. v. Charlotte-Mecklenburg Bd. of Educ., No. CIV. 3:06CV445, 2010 WL 1418334, at *6 (W.D.N.C. Apr. 2, 2010) ($300 per hour for legal services and $100 per hour for travel).

Adams and Wyner request rates of $200 per hour for Adams, $475 per hour for Wyner, and $150 per hour for Wyner's two associate attorneys who worked on this matter.[8] (Docs. 102 ¶ 11; 116 at 11.) WCS does not oppose Adams's requested rate, although

---

[8] Wyner initially requested an hourly rate of $575 per hour for his work at the administrative level and $675 per hour for his work at the district court level. (Doc. 103 ¶¶ 38, 40.) He later reduced his hourly rate to $475 per hour for all phases. (Doc. 116 at 11.) He likewise reduced the rate for his associate attorneys from $195-$250 per hour to $150 per hour. (Id.)

it argues that Wyner's proffered rate is excessive.  (Doc. 112 at 6-9.)

Starting with Adams, the court agrees that $200 is a reasonable rate.  As discussed above, courts in this circuit have routinely upheld rates of $225 to $300 per hour for experienced IDEA attorneys.  Adams acknowledges that this case was his "first foray" into the IDEA.  (Doc. 102 ¶ 7.)  It is therefore appropriate that his rate is slightly lower than the $250 per hour that the court approved for Espaillat and Howard.

Wyner supports his stated rate with several sources.  First, he attaches a declaration from Irving Joyner, an attorney licensed to practice law in North Carolina, who testifies that a rate of $300 to $700 is reasonable for "legal services in civil rights and special education matters" in the Raleigh-Durham area.  (Doc. 104 ¶ 6.)  Joyner is a well-recognized lawyer in the civil rights area, but he does not appear to practice special education law himself and the basis for his opinion in this important regard is unclear. (See id. ¶ 11 ("I am informed and believe that the current hourly rate . . . is between $550 and $700.").)  The second source is an affidavit from Peter Wright, an attorney licensed to practice in Virginia who has extensive experience in special education law. (Doc. 105.)  While Wright testifies about Wyner's experience and skill in special education law, he does not offer an opinion on what a reasonable rate is in this community.  Indeed, of his 40-

paragraph affidavit, only four paragraphs deal with this matter, and his only testimony as to an appropriate rate is his statement, "In my opinion, Mr. Wyner's hourly rate should be set at the highest rate charged by lawyers in the community providing special education services."  (Id. ¶ 40.)  Finally, Wyner provides a lengthy affidavit of his own, which includes a recitation of his prior special education cases and the rates and attorneys' fees awards he received in those cases. (Doc. 103.)  However, as those cases were primarily in the Ninth Circuit, they are of limited value here given the IDEA's charge that fee awards "shall be based on rates <u>prevailing in the community in which the action or proceeding arose</u> for the kind and quality of services furnished." 20 U.S.C. § 1415(i)(3)(C) (emphasis added).[9]

In contrast to this evidence are the declarations provided by Espaillat and Howard from Stacey Gahagan and Ann Paradis, both of whom do practice special education law in North Carolina and who assert that an hourly rate of $250 an hour is reasonable.  (Doc. 99-2.)  In addition, Adams himself states that the current hourly rates for special education lawyers in central North Carolina "range from $250 to $450." (Doc. 102 ¶ 14.)  Even Wyner's reduced

---

[9] Wyner himself has seemingly been aware of this discrepancy from the outset.  In his attorney-client retention agreement with the Solteses, he notes, "Mr. Adams has informed Mr. Wyner that the hourly rates at which [Wyner] bills time . . .  generally exceeds the hourly rates customarily charged in your community for similar services" and acknowledges there is "no assurance" that the court would award fees "based on [Wyner's] hourly billing rate."  (Doc. 126 at 13.)

rate of $475 per hour is above this range.

The court finds that $375 per hour is a reasonable fee for Wyner. This recognizes Wyner's experience and qualifications in special education matters, which this court does not dispute. The rate is also in line with previous cases in this district and circuit. See Cone, 2010 WL 1610445, at *6 (approving a rate of $250 per hour for an attorney who had over 40 years of experience and had litigated before the U.S. Supreme Court); JP ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va., 641 F. Supp. 2d 499, 514-16 (E.D. Va. 2009) (approving a rate of $300 per hour while noting that the "going rate" for experienced counsel in IDEA cases in that district is $350 per hour).

Finally, the court finds that $150 per hour is a reasonable rate for Wyner's two associate attorneys. This is the rate suggested by WCS (Doc. 112 at 9) and is in line with both the approved rates for the other attorneys in this matter and those approved by other courts in similar cases. See Sch. Bd. of Hanover Cnty., 641 F. Supp. 2d at 517 (approving a rate of $190 per hour for an associate attorney with three years of experience).

### 3. Lodestar Calculation and Adjustment

With the determination of reasonable hours expended and billing rates, the initial calculation of the lodestar becomes straightforward. Multiplying Espaillat's reduced time of 188.9 hours by $250 per hour results in $47,225. Multiplying Howard's

reduced time of 216.5 hours by $250 per hour results in a total of $54,125.00.  Multiplying Adams's reduced time of 1,091.6 hours by $200 per hour results in $218,320.  Multiplying Wyner's reduced time of 988.9 hours by $375 per hour, combined with the 298.3 hours billed by Wyner's associate attorneys at $150 per hour, results in a total of $415,582.50.

"[T]he most critical factor in determining a fee award is the 'degree of success obtained.'"  Cone, 2010 WL 1610445, at *4 (quoting Hensley, 461 U.S. at 436).  The parties spend a considerable amount of time in their briefs debating the degree of R.S.'s success in this matter, and, as to be expected, they have differing views.  Adams and Wyner characterize the result as "simply extraordinary" and encourage the court to consider time they spent in light of all the issues pursued, not in light of "the few issues ultimately decided."  (Doc. 106 at 19-20.)  WCS argues that the court's award was "substantially less" than the initial requested relief before the ALJ and urges the court to heavily reduce the fees award to somewhere between 20 and 30 percent of that requested to account for this limited success.[10] (Doc. 112 at 9, 11-15.)

---

[10] Specifically, WCS offers what it calls two "illustrations" of a possible reduction.  (Doc. 112 at 11 n.3.)  The first is based on the ultimate compensatory award for R.S.  WCS suggests this court could grant approximately one-fifth of the requested fees because the ALJ awarded R.S. five years of direct-funded, private education while this court awarded less than one year.  (Id. at 11.)  The second is based on the

The court first situates the fee requests in the context of the overall litigation. This has been a protracted affair. Relations between the parties apparently broke down early. R.S. enrolled at WCS on August 20, 2013. By that October, WCS's Special Education Director Lawrence Smiley said communication between WCS and R.S.'s parents was "strained," and by the end of that month -- even before the end of the 90-day period in which WCS was required to have developed an IEP for R.S. -- R.S.'s parents had retained counsel. While WCS was ultimately liable for failure to develop an IEP, this court noted that R.S.'s parents had "complicated, if not frustrated, the IEP development process." Woods Charter Sch., 2019 WL 1025930, at *19

R.S. was ultimately withdrawn from school in March 2014, and the OAH petition was filed October 2014. Every step along the way there were delays and extensions -- an OAH petition and then an amended petition; R.S. voluntarily dismissing SBI and BOE, then reinstating them, then their being dismissed by the ALJ; three continuations of the OAH hearing; a 14-day OAH hearing that saw Plaintiff put on 16 witnesses and 153 exhibits; a motion to file an oversized closing brief to the ALJ; and repeated requests for extensions. Relations between the lawyers were seemingly strained

---

number of issues. WCS suggests this court could grant approximately 27 percent of the requested fees because R.S., according to WCS, prevailed on only three of the eleven issues presented to the court. (Id. at 12-14.)

as well, and there were several discovery disputes. (See Doc. 103-9 at 28.) The action in this court fared no better -- an initial complaint, and two attempted amended complaints. Plaintiff's initial counsel withdrew after a litigation disagreement with Plaintiff, before this court granted R.S. an extension to find new counsel. After this court's order in March 2019, the case was stayed while Plaintiff, now proceeding *pro se*, appealed to the Fourth Circuit and then petitioned for both a rehearing and rehearing *en banc*. The facts giving rise to this litigation started in August 2013. Almost eight years have now passed, and the relief the court ordered was due to be completed by the end of the 2019-2020 school year. And still the lawsuit goes on.

The current motions reflect this. The attorneys' initial requests for fees and expenses, before any adjustments this court made, totaled $1,040,036.[11] This, over the provision of services for one student for one school year. In contrast, the court-ordered relief for R.S. totaled approximately 384 hours of private instruction or related services.[12] Even assuming a rate of $100

---

[11] This is based on Wyner's downward adjustment in his reply brief of his own rate to $475 per hour and the rate of his associate attorneys to $150 per hour. The number would be higher at his initial rates, a total of $1.2 million.

[12] The court agrees, after independently verifying, with the calculations put forward by Adams and Wyner, which were not objected to from WCS. (Doc. 106 at 13-14.) This court ordered that "WCS shall fund private

per hour, this equates to $38,400 in relief -- which means the attorneys originally requested fees and costs 27 times the value of the relief R.S. received.  Such a request would also appear to be a dramatic outlier based on precedent in this circuit.  Cf. Sch. Bd. of Hanover Cnty., 641 F. Supp. 2d at 525 (approving total fees and expenses of $315,519.89 after four years of litigation that resulted in an award of the full cost of private school for one year, or approximately $33,187 in damages).  To be sure, as pointed out by Adams and Wyner (Doc. 116 at 6-7), the fee-shifting provision in the IDEA serves both to make such claims economically viable and to deter wrongdoing.  See Sch. Bd. of Hanover Cnty., 641 F. Supp. 2d at 511 ("Only with fee shifting does the prosecution of a typical [IDEA] claim become an economically sensible possibility.  Furthermore, [defendants in IDEA] suits are more likely to be repeat violators than plaintiffs are to be repeat victims.") (alterations and citations omitted).  In other words, a single case may deter future violations, thereby protecting other

educational instruction and/or related services not less than the number of hours R.S. should have received services comparable to [adaptive physical education] between August 20, 2013, and November 17, 2013, plus the number of hours equal to three hours per school day between November 17, 2013, and the end of the 2013-2014 school year." Woods Charter Sch., 2019 WL 1025930, at *22.  There were 60 school days, or 12 weeks of 5 days, from August 20 to November 17, 2013.  (Doc. 102-6.)  The PMSD IEP provided for 45 minutes per week of adaptive physical education, so this equates to 9 hours of compensatory education.  There were 125 school days from November 17, 2013 to the end of the 2013-14 school year.  (Id.) At three hours per day, this equates to 375 hours of compensatory education, for a total of 384 hours.

students and obviating the need for future lawsuits. And this matter had some novel issues, including application of the statute of limitations and the nature of R.S.'s disability. Nevertheless, the court remains obligated to ensure that all fee awards are "reasonable" especially in light of the degree of success obtained. Cone, 2010 WL 1610445, at *4; 20 U.S.C. § 1415(i)(3)(B)(i).

Both R.S. and WCS contend that the number of issues is a relevant consideration for determining the reasonableness of the fee sought in light of the relief obtained. (Docs. 106 at 19; 112 at 12.) Complicating that analysis, however, is how the issues were presented to the ALJ and this court. R.S. identified 12 issues for the ALJ, with multiple sub-issues. (Doc. 55-1 at 3-6.) These issues were often duplicative, not clearly presented, and different from the issues presented to this court.[13]

The court finds that there were ultimately seven primary legal issues in dispute: (1) application of the North Carolina statute of limitations to R.S.'s claims; (2) whether WCS failed to provide access to R.S.'s education records; (3) whether WCS provided

_____

[13] For example, the issue "Should WCS have convened an IEP meeting on November 1, 2013, without Parents' participation and after Parents communicated with school officials about that meeting?" is listed as both its own issue and as a sub-issue to the ALJ. (Doc. 55-1 at 4, 6.) This court was unable to identify the bases by which R.S. challenged WCS' provision of comparable services and admonished against "haphazard briefing" of the issue. Woods Charter Sch., 2019 WL 1025930, at *11 n.17. Finally, one of the main issues for this court was whether WCS violated the IDEA by failing to timely develop an IEP for R.S., id. at *15-16, an issue that was seemingly not addressed at all before the ALJ.

comparable services in three primary areas -- speech and language services, physical education, and use of assistive technology; (4) whether WCS violated the IDEA by holding an IEP meeting without R.S.'s parents; (5) whether WCS violated the IDEA by failing to timely develop an IEP for R.S.; (6) whether WCS violated the IDEA by disenrolling R.S.; and (7) whether any violations of the IDEA constituted a denial of FAPE.  Of these, R.S. could fairly be said to have prevailed on four -- a failure to provide comparable services, albeit only in the area of physical education; a failure to timely develop an IEP; a failure to provide prior written notice of disenrollment; and the denial of FAPE as a result of these violations.  This means R.S. prevailed on approximately 57 percent of his issues.  However, the Supreme Court has cautioned against a "mathematical approach comparing the total number of issues in the case with those actually prevailed upon."  Hensley, 461 U.S at 435 n.11.  The final issue, the denial of FAPE, is the most important, and indeed was the animating question for the majority of issues R.S. presented to the ALJ.  (See Doc. 55-1.)  Finally, the actual award -- direct-funded, private education or related services for approximately 384 hours to compensate for services R.S. was denied during the 2013-14 school year -- is significant, albeit not nearly as much as R.S. requested and the ALJ provided, which would have been direct-funded, private education or services for five years.

Given all this, the court finds that a 33 percent reduction is appropriate. This reflects the fact that R.S. achieved relief sought on a majority of issues, including the denial of FAPE, which culminated in a meaningful award of compensatory education. However, a reduction is necessary to account for R.S.'s partial success and the protracted nature of this litigation, including the duplication wrought when Plaintiff sought to dismiss his attorneys while the matter was pending before the court.

The fees which the court will award, therefore, will be 67 percent of the lodestar amount: $31,640.75 for Espaillat; $36,263.75 for Howard; $146,274.40 for Adams; and $278,440.28 for Wyner.[14]

E.    Determination of Costs

As the prevailing party, R.S. is entitled to an award reimbursing reasonable costs incurred in the administrative proceeding and in proceedings before this court. Both R.S., through his current counsel, as well as Adams and Wyner separately have moved for a reimbursement of costs.

---

[14] While Adams and Wyner generally do not address the individual Johnson factors, Plaintiff's current counsel do, and the court has considered their arguments as to the remaining factors. Specifically, the court has considered Plaintiff's assertions that counsel had lost opportunity costs by working on the case, the fee was contingent, the change in counsel resulted in an "all-hands-on-deck approach" to this case, and the case was undesirable within the legal community. (Doc. 99 ¶¶ 63-73.) The court finds that on this record these factors are fairly compensated at the rates and hours awarded.

The court starts with Plaintiff's requests. R.S., through his counsel Espaillat and Howard, requests reimbursement for costs totaling $89,988.20. (Doc. 98 at 1.) Espaillat and Howard provide detailed cost records including receipts. (Doc. 99-4.) WCS opposes the vast majority of the costs, arguing that they are either duplicative or not recoverable.[15] (Doc. 111 at 18-20.)

The records include $37,479 in direct payments to Adams and $30,001 in the same to Wyner. Except for $1,000 in filing costs and subpoenas paid by Adams, these appear to be invoices for attorneys' fees including retainers. Such fees were presumably also included in the attorneys' time billings and calculated as part of the reasonable attorneys' fee above. WCS objects to their inclusion, and Plaintiff appears not to know exactly what these numbers entail. (See Doc. 115 at 12 ("Current counsel have no records to indicate if these fees were received by former counsel and contend they are recoverable and reasonable.").) The court will therefore deduct $36,479 from Adams and $30,001 from Wyner as these numbers are included in the fees calculations above. The $1,000 Adams paid for subpoenas and filing costs is recoverable.

---

[15] The court relies on the parties' briefing as an important part of the adversarial system to, as relevant here, identify and rebut any perceived unreasonable fees and costs. Unfortunately, the court was not helped in this instance by WCS, which merely stated, "it goes without saying that Plaintiffs should only be reimbursed once for any reasonable and statutorily recoverable costs" without specifically identifying which costs were duplicative. (Doc. 111 at 18.) This problem plagued WCS's briefing.

Plaintiff requests reimbursement for two expert witnesses and several medical evaluations. (Doc. 99-4 at 6-7.) However, fees relating to expert witnesses may not be recovered under the IDEA. Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 294 (2006); Cone, 2010 WL 1610445, at *10. The court will therefore deduct $10,453.40.

Plaintiff requests reimbursement for hotel costs for one night each for his father, Ronald Soltes, and for former counsel J. Denton Adams prior to the continued OAH hearing in February 2015. (Doc. 99-4 at 5.) However, both Soltes and Adams live locally. Lodging costs in these circumstances are not reasonable. See C.D. v. Minisink Valley Cent. Sch. Dist., No. 17 CIV. 7632, 2018 WL 3769972, at *13 (S.D.N.Y. Aug. 9, 2018). The court will therefore deduct $735.48.

The court has reviewed the remainder of the costs and finds they are reasonable. These include costs for copying and shipping, a fee for court-ordered mediation, and travel costs for Wyner. While WCS objects to the shipping, mediation, and travel costs, the court finds they are reasonable here. It is true, as WCS points out (Doc. 111 at 19-20), that the Supreme Court has noted that "'costs' is a term of art" and the use of that term in the IDEA "strongly suggests that § 1415(i)(3)(B) was not meant to be an open-ended provision that makes participating States liable for all expenses incurred by prevailing parents in connection with an

IDEA case -- for example, travel and lodging expenses or lost wages due to time taken off from work." Arlington Cent. Sch. Dist., 548 U.S. at 297. However, that statement in Arlington Central was dicta unnecessary to the resolution of that case. The Fourth Circuit has held in other attorneys' fees cases that "where attorney's fees are expressly authorized by statute," the trial court "has authority to include litigation expenses as part of a 'reasonable attorney's fee,'" including for "necessary travel." Herold v. Hajoca Corp., 864 F.2d 317, 323 (4th Cir. 1988) (citing Wheeler v. Durham City Bd. of Educ., 585 F.2d 618, 623 (4th Cir. 1978)). This is because "attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients." Charlotte-Mecklenburg Bd. of Educ., 2010 WL 1418334, at *8 (quoting LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 763 (2d Cir. 1998)). And district courts in this circuit routinely reimburse for reasonable travel costs in IDEA attorneys' fees cases. See, e.g., School Bd. Of Hanover Cnty., 641 F. Supp. 2d at 525; Charlotte-Mecklenburg Bd. of Educ., 2010 WL 1418334, at *8. The court will do likewise.

Accordingly, with the above deductions, the court will award Plaintiff, through his current counsel, $12,319.32 in costs.

Plaintiff, through Adams and Wyner's motion, also seeks reimbursement of costs. Adams has requested reimbursement for printing expenses and deposition transcripts totaling $4,485.59.

41

(Doc. 102 ¶ 18.)  WCS does not object to this amount (Doc. 112 at 17), and the court agrees that they are reasonable.

Wyner seeks reimbursement totaling $13,457.58 for costs associated with the OAH hearing and $1,659.47 for costs associated with the litigation in this court.  (Doc. 103 ¶¶ 56-57.) WCS opposes many of these costs as duplicative or not recoverable. (Doc. 112 at 15-17.)  As for the costs associated with the OAH hearing, the court has independently reviewed the records and finds that a total of $5,021.41 requested is duplicative of the same costs submitted by Plaintiff through his current counsel.  The court will therefore deduct this amount.  The remainder are costs associated with travel, lodging, copying, postage, and shipping which are generally recoverable for reasons given above.  As for the costs associated with the litigation in this court, Wyner requests reimbursement for "meals" and "research" without specifying when these expenses occurred or why he is seeking reimbursement for them.  Shorn of this context, the court cannot say these costs are reasonable, especially since research would normally be a part of the fees calculation (unless a separate expense for online database access) and meals would generally only be recoverable if part of necessary travel.  Accordingly, the court will deduct $168.97.  The other expenses are for copying and filing fees, and the court finds they are reasonable.  With these adjustments, the court will reimburse Wyner $8,436.17 for the OAH

hearing and $1,490.50 for litigation in this court, for a total of $9,926.67.

In sum, the court approves the following reimbursements for costs: $12,319.32 to Plaintiff through his current counsel; $4,485.59 to Adams; and $9,926.67 for Wyner.

**F.  Pre- and Post-Judgment Interest**

Adams and Wyner also seek pre- and post-judgment interest on any attorneys' fee award.  (Doc. 106 at 21.)

"[I]t is an open question whether pre-judgment interest may be obtained in an IDEA case."  <u>T.B. v. San Diego Unified Sch. Dist.</u>, 293 F. Supp. 3d 1177, 1207 (S.D. Cal. 2018) (citing <u>McAllister v. Dist. of Columbia</u>, 160 F. Supp. 3d 273, 277 n.1 (D.D.C. 2016)).  However, the IDEA does not specifically provide for pre-judgment interest, and "absent a statutory mandate the award of pre-judgment interest is discretionary with the trial court."  <u>Quesinberry v. Life Ins. Co. of N. Am.</u>, 987 F.2d 1017, 1030 (4th Cir. 1993) (en banc).  While some courts have awarded pre-judgment interest in the context of IDEA attorneys' fees, Adams and Wyner cite to no controlling authority in the Fourth Circuit, and the court is unaware of any mandating such a result.  Because "[p]rejudgment interest is an element of complete compensation," <u>West Virginia v. United States</u>, 479 U.S. 305, 310 (1987), courts in this circuit will at times award such interest on an amount due in order to make the victim whole.  See <u>Mary Helen Coal Corp. v.</u>

Hudson, 235 F.3d 207, 210 (4th Cir. 2000) (awarding pre-judgment interest on refunded premiums that were found to have been unconstitutionally taken); Charlotte-Mecklenburg Bd. of Educ., 2010 WL 1418334, at *9 (awarding pre-judgment interest on a tuition reimbursement award in an IDEA case).

The court declines to award pre-judgment interest in this case. "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss." City of Milwaukee v. Cement Div., Nat'l Gypsum Co., 515 U.S. 189, 195 (1995). Here, Adams and Wyner seek compensation for a delay in payment of their fees -- fees that were not awarded until this judgment. This goes beyond the intended purpose of a fees award in an IDEA case, which are awarded "to a prevailing party who is the parent of a child with a disability," not their former counsel. 20 U.S.C. § 1415(i)(3)(B)(i).

Adams and Wyner also request an award of post-judgment interest. Post-judgment interest is provided on "any money judgment in a civil case recovered in a district court," calculated from the date of the entry of the judgment. 28 U.S.C. § 1961(a). "The phrase 'any money judgment' in § 1961(a) includes a judgment awarding attorney's fees and other costs." Charlotte-Mecklenburg Bd. of Educ., 2010 WL 1418334, at *9 (quoting Holbrook v. Dist. of Columbia, 305 F.Supp.2d 41, 48 (D.D.C. 2004). Accordingly, the court will award R.S. post-judgment interest, calculated as

specified in 28 U.S.C. § 1961(a), on the award of attorneys' fees and costs from the date of entry of this judgment until the attorneys' fees are paid in full.

## III. CONCLUSION

This case raises some troubling questions.

On the one hand, the court is sympathetic to a parent's understandable desire to zealously advocate for his child. R.S. certainly deserves, as a matter of both federal law and basic fairness, to receive a "free appropriate public education" that accounts for his special needs. And a single case can motivate schools to meet their obligations under the law and to deter future violations, all protecting future students.

On the other hand, the court is awarding more than $500,000 in fees and costs, which will be paid by a public school system (and thus by the taxpayers), and which is reduced from the attorneys' initial request of some $1.2 million. This, as the court has observed previously, is all based on the denial of educational services by a single school, to a single student, over a single school year. It is hard to know where the process got derailed -- whether it was the strain in communication between the Solteses and WCS early on, the lengthy 14-day hearing before the ALJ (that reveals little effort to streamline process), or the break-down in the relationship between the Solteses and Adams and Wyner that saw the attorneys withdraw from the case while Ronald

Soltes proceeded *pro se*.  Regardless, it is this court's job to ensure that any final fee is reasonable especially in light of the results obtained.  20 U.S.C. § 1415(i)(3)(B)(i).  This is what the court has endeavored to do here.  However, one wonders whether there is not a better way to have resolved the dispute with much less cost to all.

For the reasons stated,

IT IS THEREFORE ORDERED that the motions for attorneys' fees and costs (Docs. 98; 101) are GRANTED IN PART AND DENIED IN PART.  Plaintiff shall recover attorneys' fees totaling Four-Hundred Ninety-Two Thousand Six-Hundred Nineteen and 18/100 dollars ($492,619.18) and costs of Twenty-Six Thousand Seven-Hundred Thirty-One and 58/100 dollars ($26,731.58), for a total of Five-Hundred Nineteen Thousand Three-Hundred Fifty and 76/100 dollars ($519,350.76).  Post-judgment interest on the entire amount due, calculated as specified in 28 U.S.C. § 1961(a), will accrue from the date of entry of this judgment until the total award is paid in full.

                                         /s/   Thomas D. Schroeder
                                    United States District Judge

June 25, 2021